D/F



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

THE PROCTER & GAMBLE COMPANY, : 04-CV-2820

Plaintiff,

-against- : US Courthouse
Central Islip, NY

XETAL, INC. d/b/a APO HEALTH, INC. and UNIVERSAL MEDICAL DISTRIBUTORS, INC.; ATM, INC.; TRANS CUSTOMS SERVICES; BROTHERS TRADING CO., INC. d/b/a VICTORY WHOLESALE GROCERS A/k/a SK-TORS; and JOHN DOES 1-50,

Defendants. : August 4, 2004
11 a.m.

- - - - - - - - - - - - - - - X

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE DENIS R. HURLEY
UNITED STATES DISTRICT JUDGE

APPEARANCES:
(By Telephone)

For the Plaintiff: KRAMER LEVIN NAFTALIS & FRANKEL LLP
919 Third Avenue
New York, New York 10022-3852
BY: GEOFFREY POTTER, ESQ.
YEHUDIS LEWIS, ESQ.

FULBRIGHT & JAWORSKI LLP
666 Fifth Avenue - 31st Floor
New York, New York 10103
BY: MARK N. MUTTERPERL, ESQ.

For Defendant SK-TORS a/k/a VICTORY:

STRAUSS & TROY
150 East Fourth Street
Cincinnati, Ohio 45202-4018
BY: R. GUY TAFT, ESQ.

Continued.....

APPEARANCES (Continued):

(By Telephone)

For the Defendant SK-TORS a/k/a VICTORY:

BONDY & SCHLOSS LLP
60 East 42nd Street - 37th Floor
New York, New York 10165
BY: JOSEPH P. GOLDBERG, ESQ.

JAMES OFFICE, ESQ.
General Counsel
Victory Wholesale Grocers

ALSO PRESENT:
(By Telephone)

Todd Moss
Director, Health & Beauty Products
Victory Wholesale Grocers

Court Reporter: Dominick M. Tursi, CM, CSR
US District Courthouse
1180 Federal Plaza
Central Islip, New York 11722
(631) 712-6108 Fax: 712-6124
DomTursi@email.com

Proceedings recorded by mechanical stenography.
Transcript produced by computer.

THE COURT: Can you hear me? This is Judge Hurley.

A VOICE: Just barely.

THE COURT: I heard a voice in the distance which said *just barely*.

Can that person hear me?

It seems not.

MR. TAFT: This is Guy Taft. Can you hear me okay, Judge?

THE COURT: I can hear you fine.

MR. TAFT: Good.

THE COURT: Who else is on the line?

MR. POTTER: This is Jeffrey Potter, with Kramer Levin Naftalis & Frankel, counsel for the plaintiff. With me is my colleague Yehudis Lewis.

Excuse me. Because of the short notice I'm actually calling from a pay phone outside of the Appellate Division, so if there is any background noise I will have to get off.

THE COURT: I can hear you fine.

MR. MUTTERPERL: Also for Procter & Gamble is Mark Mutterperl, from the law firm of Fulbright and Jaworski.

THE COURT: Good morning, Mr. Mutterperl.

MR. GOLDBERG: Joseph Goldberg, on behalf of the

defendant Victory, from the law firm of Bondy & Schloss.

THE COURT: Yes.

And, Mr. Goldberg, is anybody with you on behalf of Victory?

MR. GOLDBERG: Yes. Mr. Taft is on the line as well.

THE COURT: That's right. Mr. Taft, who started off the appearances a moment ago.

MR. TAFT: This is Guy Taft. Good morning.

Just to round out the record, also here at my office is Jim Office, who is general counsel for Victory. And also Todd Moss, who is Victory's representative, who is the director of health and beauty products.

THE COURT: Very good. Thank you.

I'm in receipt of your respective letters. I have the letter from Strauss and Troy which is dated July 30. And I have the letter from Procter & Gamble -- the letter being signed by I believe Mr. Potter, but let me check -- and that bears the same date.

I have reviewed the letters. I have a few questions and a few comments. But firstly -- and this is directed to Mr. Taft and Mr. Goldberg -- with respect to the information that you would like to develop at the preliminary injunction hearing, I do think it is relevant what Victory did concerning the subject products. So how

Victory learned about the problem, what action they took, what costs that incurred, what efforts they have made to prevent a recurrence of what transpired with respect to Rite-Aid and presumably some other customers of Victory, all of that would seem to me to be appropriate.

To the extent that Victory would like to go beyond that and go into the practice that Victory has concerning this type of problem generically, that I don't believe is necessary for purposes of this hearing.

The reason for that is, there is an element of cumulativeness, No. 1. And, No. 2, every situation varies somewhat. So under 403 your general practice and so forth will not be pursued. But what you did in this case, which I think is probative of the question of whether injunctive relief is required, will be a legitimate area of inquiry and I will permit that.

Now, there are some other questions and I want to get the input from Mr. Potter or Mr. Mutterperl on this issue.

Victory would like to develop the dimensions of the problem; in other words, what information does Procter & Gamble have concerning the amount of counterfeit product that was released into the market. And they would like to pursue what actions if any Procter & Gamble has taken against any other entities which may be in a similar

situation to Victory; in other words, they were a distributor of these counterfeit products.

That does seem like a very broad request within the ambit of what we are trying to accomplish, but I would like to get a little more input.

Firstly, let me ask Procter & Gamble's counsel -- and I will hear from either that would like to speak, or both if necessary -- concerning why you feel that would be inappropriate for the preliminary injunction hearing.

MR. POTTER: This is Mr. Potter. There are two questions that you raised and I would like to address. First, the issue regarding scope of the problem.

As is obvious to everyone, these products are not Procter & Gamble's. These are counterfeit products that are out there.

To the extent we've done an investigation, the *we* is the lawyers here on the telephone and in-house counsel at Procter & Gamble, and that would be work product.

The extent we have received documents through subpoenas, those documents have already been turned over en masse. We have released a box of them to Victory's counsel, and looking through that they can get, as we have, a degree of the size, of the amount of product that

we have been able to identify so far.

And we are talking in the range of tens of thousands, if not hundreds of thousands, of bottles. So it is somebody who obviously has one might say an unlimited capacity to continue to manufacture these materials.

There is no business person at Procter & Gamble who can tell you this information. You would have to depose me or Mr. Mutterperl or one of our associates. And that would be inappropriate because what we know we have learned through our own work product.

And, most importantly, that doesn't strike me as relevant to what Victory might do in the future if confronted with these counterfeit goods.

In terms of what P&G has done with other people, there is of course the action that has been brought here. And there is some difficulty because we have brought an action, but it is not public, an ex parte action, somewhere else in the world which, due to those court rules, and I will need to confirm it, but it can't be disclosed at this point in time. All I can say is, it is in another part of the world.

And as to our plans and negotiations with counsel for other companies that have been involved with these products, there are two problems with that.

One is that, again, you would have to depose either myself or Mr. Mutterperl because these negotiations have been carried out by counsel, between counsel.

And, most importantly, what other people may do, what other gray market distributors may do, what other people in the counterfeit chain may do, would strike me as completely irrelevant to what Victory might do in the future should it be offered additional counterfeit goods; to the measures that Victory would take in the future to protect the public from passing on these counterfeit goods.

As we mentioned in our very brief letter, there are any number of criminals around the world who, with enough fortitude and a little bit of capital, can counterfeit health and beauty aid products. However, there are only a small handful of distributors that can carry and get into retail stores these products in the trailer truckload quantity, in the tens-of-thousands-of-bottles quantity. And Victory is one of those.

So to us it is very important, the measures that Victory is willing to take in order to protect our trademarks and in order to protect, at the end of the line, the consuming public. It is because it got by Victory and one or two other gray market distributors that tens of thousands of people in the United States have used

this adulterated counterfeit product.

And what we think is important is that the court focus for purpose of this injunction on Victory because it is Victory who is before the court today and what steps Victory has taken and whether it is appropriate to enjoin Victory and what the scope of that injunction should be to keep this from repeating in the future.

THE COURT: All right. Thank you, Mr. Potter.

Now let me hear from Victory. Why do you feel these two areas should be pursued?

MR. TAFT: This is Guy Taft. If I may, judge.

THE COURT: Yes.

MR. TAFT: The court will recall that there are essentially three prongs to what has to be proved for a preliminary injunction. Two of those are the irreparable harm issues; the other is the balancing of the hardships.

I think it is critical for the court to understand the scope of the problem in order to determine the hardships that will or will not result from issuing an injunction and irreparable harm in balancing the hardships.

And the reason I say this is that it sounds like P&G is telling us that there are a lot of companies out there who have sold this product. And it sounds like they are telling us that there has been a lot of this product

sold out there.

And it seems to me that, or what we would like to present to the court is that Victory, in looking at the overall picture, would be a relatively small percentage of product out there. And certainly if the court enjoins this one company, Victory, out of all these companies' products out there -- Victory, by the way, hasn't sold any since April and who has dealt with 75 percent of the product already or the customers it sold it to -- it seems to me that it is not going to benefit Procter & Gamble at all for this court to enjoin Victory. It will certainly penalize Victory.

But I don't believe that is the purpose of an injunction.

Now, if the court feels that Victory is a bad actor, then that's different. And if the court feels that the only way to keep Victory from selling this in the future is to put an injunction on Victory, that's different, your Honor.

But if we are looking to prevent irreparable injury, if you believe that Victory, itself, was an innocent victim in this, that it is an innocent victim and that it is totally rare to its business to deal in counterfeit product, if you believe it, then the only issue is this preliminary injunction necessary to protect

Procter & Gamble.

And I think the court needs to know the scope of the problem out there to determine if an injunction will mean anything to Procter & Gamble other than penalizing this one company and their small part of this entire business.

So that's why I think it is way important to know the scope of this problem.

And then we get to balancing the hardships, and we look at what is the hardship on P&G if this court does not enjoin Victory. And again, I think it comes to the scope of the problem and what good it would do.

And then I think on the other side is to look at the harm, in balancing the harm that would be caused to Victory competing out in the marketplace. Again, all these other companies that don't have any injunctions on them and yet the court knows, and we know, have sold the same product.

So that's the reason I guess for that area of issues that we would like to present.

THE COURT: Very good. Thank you, Mr. Taft.

MR. POTTER: Your Honor? This is Mr. Potter.

If I could just very quickly remind everyone on the call, and the court, of the narrowness of the scope of injunctive relief that's being considered here.

What we are merely asking for that Victory, when it does not know that the products it purchased originated with Procter & Gamble, had they take a sample of those products and send them to a lab before they resell them.

THE COURT: Mr. Potter, I have read the proposed--

MR. POTTER: We are --

THE COURT: -- injunction.

MR. POTTER: We are talking about a very, very narrow sending out and sampling a few bottles, is something that can be done quickly and inexpensively, and it is something that we have agreed to do, ourselves, for them if they find that that $200 or $300 expense is too great.

THE COURT: The purpose of this call is not to determine whether a preliminary injunction will issue. The purpose of this call is for the court to set the parameters for the hearing.

The reason we are doing that now is that I understand that counsel have a telephone conference scheduled with Judge Wall which will take place immediately after this call.

Judge Wall's function will be to determine the scope of discovery. Obviously, the scope of discovery depends in large measure on what this court indicates will

be the subjects that will be appropriately pursued during the course of the hearing. So I don't want to go any further into whether injunctive relief should issue.

But I did have the questions that I have just raised. I have heard both counsel exhaustively on the subject, and my thoughts are essentially as follows.

Firstly, on the scope of the problem. I would certainly agree that if the number of units that were sold by Victory is de minimis -- so we are talking about hundreds of bottles and so forth -- that would be one scenario. But from what I have heard, at least thus far, the number is more in the thousands.

So then the question is, if thousands of units are sold, what percentage of that, of the total problem, does that represent? And it is basically Victory's position that until I'm aware of the dimensions of the total problem, I really can't craft an appropriate injunction and in fact no injunction should issue.

As I alluded to before, if we are talking about a few bottles of shampoo, that's one thing given the attendant circumstances. If we are talking about thousands of bottles of shampoo as an absolute number regardless of what percentage that may be of the total, we are talking about something else.

Another observation on the idea of the scope of

the problem. As has been indicated by Mr. Potter, at least at this juncture, Procter & Gamble presumably doesn't know the scope of the problem.

And that would seem to make sense. The reason is that these are counterfeit products, and where they emanate from, how many have been released into the marketplace, is essentially problematical. But if that was an appropriate line of inquiry for the preliminary injunction hearing, I would certainly permit it notwithstanding the difficulty and the uncertainty of traveling down that road. But I don't think it is.

So we are not going to go into the scope of the problem. What we will do is, whatever information that either party has concerning the number of units that were handled by Victory, that certainly will be appropriate and will be fully pursued by the parties to the extent they deem it appropriate.

Now, the other idea is, there are other distributors of this product besides Victory. Mr. Potter has indicated that the number of distributors that can handle thousands of units -- in other words who are major distributors -- he has used the term is a *handful*. It appears, however, there may be a number of other entities which handle a lesser quantity of product.

That again I think for purposes of this

hearing -- and again, I have no preconception obviously of whether there will be injunctive relief awarded to Procter & Gamble or not -- we will determine that after I have heard the evidence at the hearing and have listened to the arguments of counsel. But at this juncture, the fact there may be, and apparently are, other entities that disseminated these products, presumably or hopefully inadvertently, really isn't sufficiently germane under 403 to open this hearing to a determination as to what other culprits slash victims, depending upon your point of view, were involved in the distribution besides Victory.

The issue here is really, I think, what did Victory do? What is the harm if any to Procter & Gamble? Again, in absolute terms, we are not going to do it on a relative basis. What is the likelihood of success that Procter & Gamble enjoys in this case? And then, to the extent that some courts feel in a preliminary injunction context you will have to consider the balancing of the equities and the balancing of the respective hardship, I will permit that as well.

So to back up and to try to synopsize where we are so that you can have a meaningful conversation with Judge Wall in a moment, I am going to permit evidence concerning when Victory learned of the problem, how they learned of the problem, what efforts they took to address

the problem, the associated cost to Victory and other information that they have, such as that they haven't sold the product voluntarily since April of 2004, et cetera.

I will consider all of that on the issue of whether, among other things, injunctive relief is necessary, or whether there is a likelihood of recurrence of the problem concerning the sale of the counterfeit products.

We are not going to go into the Victory's general policies, Victory's general response to other problems of a like kind that may have happened in the past or conceivably contemporaneously with the problem with the Procter & Gamble shampoo.

We are not going to go into, for the reasons indicated, the total scope of the problem, although there will be evidence obviously presented as to the number of units that Victory distributed. And that certainly is very relevant. Again, if it is a minor number of products, that's one thing given the attendant circumstances. If it is thousands of units, it seems to me that, given the effect on Procter & Gamble, given the effect on the public and so forth, that the matter should be further pursued. Whether it would result in an injunctive relief or not will depend on a host of circumstances.

Lastly, and over the objection of Victory -- and all of this is a matter of record, as you are aware, since, as I indicated earlier, a court reporter is present and your positions have been recorded as well as my response to your positions -- we are not going to go into other costs that may have been involved in the distribution of the product. We are not going to go into the investigation by Procter & Gamble. I really am going to look prospectively on this.

Now, I understand that when you look ahead, to some extent what has happened in the past provides guidance. So I recognize that. But what we are going to do in that regard is, what did Victory do concerning this product? That is going to be the backdrop. And then we are going to move ahead from there.

So the forgoing constitutes my order concerning the parameters that will exist when we have the preliminary injunction hearing. And I hope this will be helpful to the parties when they speak to Judge Wall momentarily.

Now, I don't want to rehash what we have done. I have already made the ruling and that is it. However, if there is anything that I haven't addressed that I should have addressed, either as framed in the letters or as mentioned during our conversation and colloquy in the

courtroom the other day, I will obviously entertain comments in that regard.

Is there anything we should do further today consistent with what I have just said?

MR. MUTTERPERL: No, your Honor.

THE COURT: From Victory?

MR. TAFT: From Guy Taft, your Honor, I cannot think of anything. I think you have covered it. Unless Mr. Goldberg can think of anything that's remaining.

MR. GOLDBERG: Your Honor, I just had one or two quick issues.

Because this is a mandatory injunction, one of the things the court will need to consider is whether extreme or serious damage would result from a denial of the injunction.

And with respect to that, we have sought documents concerning all reports or test results as well as consumer complaints concerning the products.

Would those be a fair topic for you to delve into at the preliminary injunction hearing, given that standard and given that we believe that those issues are germane to the court's decision?

THE COURT: The question is the test results that they have obtained; that Procter & Gamble has obtained?

MR. GOLDBERG: Yes.

THE COURT: And this would be to show, what, the --

MR. GOLDBERG: For instance, whether or not the test results would show that there is no public safety issue here.

THE COURT: Because of a very low percentage or something of that sort? And/or that the product, itself, to the extent it departs, it is a de minimis departure?

MR. GOLDBERG: Exactly, your Honor. As well as customer complaints; whether this is one, isolated complaint; whether there has been more than the one complaint that we are aware of.

THE COURT: Let me listen to Mr. Potter.

What is your response to that?

MR. POTTER: Your Honor, this is a two-point question. And I first have the comment to make that we are about to get on the phone with the magistrate to deal with discovery issues, and this sounds to me an awful lot like a discovery issue.

We are prepared to and in fact have already offered a 30(b)(6) witness to deal specifically with the public health risks that are presented by these particular counterfeit products and counterfeit shampoos in general, and believe that that goes to the weighing of the balances

and the burden here, and are prepared to produce both the bacteriological testing that has been done of the product and information and testing that's been done on the ingredients in the counterfeit, everything from its viscosity, its ability to act as a cleansing agent.

And we think that goes in part to the balancing of it as to, you know, how badly the public is being defrauded by receiving this counterfeit product.

And we will in fact be glad to put on that evidence and will put it on in our own affirmative case and will produce what nonprivileged responsive documents exist that deal with those issues.

So I don't think that we have a dispute there.

MR. MUTTERPERL: Your Honor, this is Mark Mutterperl.

On the other aspect of Mr. Goldberg's concern, the number of consumers who have contacted Procter & Gamble to complain, has nothing to do with it.

THE COURT: That I'm not going to permit.

MR. MUTTERPERL: Thank you.

THE COURT: But the other point that Mr. Goldberg raised, it seems to me, after listening to counsel, to Mr. Mutterperl, that in fact there really isn't any dispute.

But what I'm going to do, at this point I do

think that generally falls into the area of discovery.

We do know that during the hearing, as has been indicated, Procter & Gamble will endeavor to establish the risks associated with the dissemination of these counterfeit products. So within that ambit, that is going to provide these various reports. Presumably, that will be part of the predicate for the expert's opinion or the individual's opinion.

So at this point what I will do is, unless there is something further, I will terminate this call so that you can touch base with Judge Wall.

Is that satisfactory at this point?

MR. GOLDBERG: Yes, sir.

MR. MUTTERPERL: Yes, sir.

THE COURT: What I would suggest is, if you could wait about 10 minutes and then initiate the call with Judge Wall. Very good.

Thank you very much, gentlemen.

(Proceedings adjourned at 11:35 am.)