UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE PROCTER & GAMBLE COMPANY,<br><br>Plaintiff,<br><br>- against -<br><br>XETAL, INC., et al.,<br><br>Defendants. | 04 Civ. 2820 (DRH) |

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT GARY GRUENBERG

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 AVENUE OF THE AMERICAS NEW YORK NY 10036

# Table of Contents

Page

PRELIMINARY STATEMENT ........ 1

STATEMENT OF FACTS ........ 2

A. The Counterfeiting Scheme ........ 2

B. Gruenberg Deliberately Destroyed Key Evidence ........ 3

C. Gruenberg Has Tried To Coerce P&G Into Dropping the Action ........ 5

ARGUMENT

POINT I. P&G SHOULD BE AWARDED SUMMARY JUDGEMENT AS TO LIABILITY ........ 6

A. P&G Owns The Pantene, Pro-V and Head & Shoulders Names And Designs ........ 6

B. Gruenberg Knowingly Manufactured And Sold 11 Different SKUs of Counterfeit Pantene and Head & Shoulders ........ 8

POINT II. P&G IS ENTITLED TO INJUNCTIVE RELIEF AND ENHANCHED DAMAGES AS A MATTER OF LAW ........ 11

A. P&G Is Entitled To Permanent Injunctive Relief ........ 11

B. P&G Is Entitled To $11 Million In Statutory Damages ........ 12

C. P&G Is Entitled To Attorney's Fees and Costs ........ 13

D. P&G Is Entitled to Punitive Damages ........ 14

CONCLUSION ........ 15



KL3 2570629.1

# TABLE OF AUTHORITIES

**Cases** **Pages**

*Brennan's Inc. v. Brennan's Rest. L.L.C.*, 360 F.3d 125 (2d Cir. 2004) ........ 11

*Genesee Brewing Co., Inc., v. Stroh Brewing Co.*, 124 F.3d 137 (2d Cir. 1997) ........ 11

*Getty Petroleum Corp. v. Island Transp. Corp.*, 878 F.2d 650 (2d Cir. 1989) ........ 14

*Gucci America, Inc v. Duty Free Apparel*, 286 F. Supp. 2d 284 (S.D.N.Y. 2003) ........ 8

*Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448 (S.D.N.Y. 2005) ........ 8

*New York Racing Ass'n, Inc. v. Stroup News Agency Corp.*, 920 F. Supp. 295 (N.D.N.Y. 1996) ........ 14

*Nike, Inc. v. Top Brand Co.*, 2006 WL 2946472 (S.D.N.Y. Feb. 27, 2006) ........ 12

*Phillip Morris USA Inc. v. Marlboro Express*, 2005 WL 2076921 (E.D.N.Y. Aug. 26, 2005) ........ 6, 8, 11, 12

*Quaker State Oil Refining Corp. v. Kooltone, Inc.*, 649 F.2d 94 (2d Cir. 1981) ........ 13

*Silhouette Int'l Schmied AG v. Vachik Chakhbazian*, 2004 WL 2211660 (S.D.N.Y. Oct. 4, 2004) ........ 13

*The Procter & Gamble Co. v. Quality King Distribs.*, 123 F. Supp. 2d 108 (E.D.N.Y. 2000) ........ 10

*W.W.W. Pharmaceutical Co., Inc. v. The Gillette Co.*, 984 F.2d 567 (2d Cir. 1993) ........ 6

## STATUTES, RULES & LEGISLATIVE MATERIALS

15 U.S.C. § 1116(a) ........ 11

15 U.S.C.§ 1117 ........ 13,12

15 U.S.C. § 1114 ........ 6

15 U.S.C. § 1125 ........ 6

Plaintiff, The Procter & Gamble Company ("P&G"), respectfully submits this memorandum of law in support of its motion under Federal Rules of Civil Procedure Rule 56 for an order awarding it summary judgment, a permanent injunction, statutory damages, pre-judgment interest, punitive damages and attorney's fees against defendant Gary Gruenberg.

**PRELIMINARY STATEMENT**

Through comprehensive discovery, including hundreds of hours of testimony, thousands of pages of documents and two *ex parte* seizures, P&G has obtained overwhelming evidence that defendant Gary Gruenberg conspired with his brother-in-law, defendant Fred Harrick, to manufacture 11 different versions or shop keeper units ("SKU") of Pantene and Head & Shoulders shampoo, and then knowingly sold hundreds of thousands of bottles of that counterfeit shampoo to distributors in the United States.

Gruenberg has done everything within his power to obstruct P&G's investigation and to coerce P&G into dropping this lawsuit. He deliberately destroyed key evidence of the counterfeiting scheme and, through an action filed by his attorney purportedly on behalf of the consuming public, sought to hold P&G responsible for the very counterfeit Pantene and Head & Shoulders hair care products that he himself knowingly manufactured and sold.

On this extraordinary record, P&G is entitled to the maximum relief authorized by the law: a permanent injunction, statutory damages of $11 million, punitive damages, attorney's fees and related investigative fees of $5 million and pre-judgment interest.

## STATEMENT OF FACTS

### A. The Counterfeiting Scheme

Defendant Harrick, a resident of Panama, runs an international counterfeiting ring with operations in, among other places, Asia, Curacao and the United States. Gruenberg is the ring's U.S. operative. Defendant Paul Chou is the ring's operative in Asia.

In October 2004, P&G obtained an order from the Panamanian court authorizing P&G to search Harrick's offices and his computers for evidence concerning Harrick's counterfeiting activities. (De La Cruz Aff. at ¶ 3).[1] A team of computer experts retained by P&G copied the hard drives of each of Harrick's computers in Panama. (De La Cruz Aff. at ¶ 4). Back in the United States, the experts analyzed and forensically restored and retrieved data from the hard drives, including e-mail communications. (De La Cruz Aff. at ¶ 6).

In the e-mails P&G's experts retrieved from Harrick's computers in Panama, Gruenberg repeatedly admits that he conspired with Harrick and Chou to manufacture and sell Pantene and Head & Shoulders shampoo. *See* Point IB below. In total, Gruenberg sold 267,000 bottles of counterfeit Pantene shampoo in 6 different SKUs, and 248,892 bottles of counterfeit Head & Shoulders in 5 different SKUs, to two U.S. distributors: settling defendants APO Health ("APO") in Long Island and The

---

[1] All references to "De La Cruz Aff." refer to the accompanying affidavit of Miguel De La Cruz. All references to "Potter Decl. I" refer to the accompanying declaration of Geoffrey Potter, Esq. dated February 1, 2007. All references to "Potter Decl. II" refer to the accompanying declaration of Geoffrey Potter dated August 12, 2004.



KL3 2570629.1

Global Marketing Center ("Global") in Miami. (Potter Decl. I Ex. A at 33-37, 40, 54, 67-69; Ex. B at 29, 68, 87, 88; Ex. C at 14, 15, 114, 158, 159; Ex. D). This counterfeit shampoo, which at best did nothing to clean hair, and, at worst, contained contaminants that could be fatal to individuals with compromised immune systems, was likely used by tens of thousands of unsuspecting families and likely affected more than one million adults and children. (Potter Decl. I Ex. E).

Shampoo was not the only product Gruenberg counterfeited. Other e-mails retrieved from Harrick's computers establish that Gruenberg knowingly conspired with Harrick and/or Chou to manufacture counterfeit Reynolds Wrap Aluminum foil, Duracell batteries, Gillette razors and, even pharmaceuticals, such as Viagra. (Potter Decl. I Ex. C at 15, 16, 21, 67; De La Cruz Aff. Exs. B, C, D, E).

### B. <u>Gruenberg Deliberately Destroyed Key Evidence</u>

On August 10, 2004, P&G served a comprehensive non-party document and deposition subpoena on Gruenberg (the "Subpoena"). (Potter II Decl. at ¶ 3). The Subpoena requested all records relating to the counterfeiting activities of Gruenberg and his company AMG. (Potter Decl. II Ex. A). Later that day, Gruenberg had a telephone conversation with P&G's attorneys about the Subpoena. (Potter Decl. II at ¶ 4).

In that call, Gruenberg stated that he had a company called "AMG" and worked out of his home. He said that his principle business was selling fragrances and sunglasses through the Internet but that he also occasionally dealt in Pantene and Head & Shoulders hair care products. (Potter Decl. II at ¶ 7).

Gruenberg said that he had kept all of the documents concerning his sale of Pantene and Head & Shoulders hair care products on his computer, the same computer on which he runs his Internet business. (Potter Decl. II at ¶ 8). He said that he could not produce any of those documents in response to the Subpoena because his computer "had a virus" that caused the hard drive to loose all of its data. He further elaborated by stating that he was forced to reformat his hard disk drive and reload all of his software. (Potter Decl. II at ¶ 9).

P&G's counsel offered to arrange for a computer technician to restore all of the "lost" data on Gruenberg's computer. Gruenberg responded that his hard drive was "so infected by the virus" that he had replaced it with a new one. However, he agreed to permit a computer technician to visit his home and inspect the computer. (Potter Decl. II at ¶ 10).

On August 11, 2004, a computer technician accompanied by a private investigator appeared at Mr. Gruenberg's apartment. Gruenberg refused to let them into his apartment. On a telephone call that same day with P&G's counsel, Gruenberg said that he had "thrown his computer away" because it had been "spiked" by lightening. (Potter Decl. II at ¶ 12). Gruenberg claimed to be conducting his Internet business on his children's computer. (Potter Decl. II at ¶ 13).

On August 12, 2004, the Court issued an ex parte seizure order authorizing P&G to search Gruenberg's home and computers for evidence of his counterfeiting activities. (Potter Decl. I Ex. F). By the time P&G's computer technicians executed the order the next day, all of the evidence had been either removed or destroyed. Had

Gruenberg cooperated with P&G in its investigation, P&G would have saved hundreds of thousands of dollars in attorney's fees and investigative fees in obtaining and executing a seizure order in Panama.

### C. Gruenberg Has Tried To Coerce P&G Into Dropping the Action

In June 2005, approximately one year after P&G commenced this action and raided Gruenberg's home, Gruenberg's counsel, Michael Miller,[2] commenced a putative class action against P&G in the Southern District of Florida purportedly on behalf of all persons who had been injured or may develop injuries from the use of the very counterfeit Pantene and Head & Shoulders hair care products that *Gruenberg* manufactured and then sold to distributors in the United States. (Potter Decl. I Ex. G). Incredibly, the complaint alleged that P&G knew that its products were counterfeited, knew that the counterfeit products were of inferior quality or dangerous and, as a consequence, breached various federal and state statutory and common law duties by failing to warn regulators and consumers of the risks that the counterfeit products posed.

P&G moved to dismiss the action and for sanctions. (Potter Decl. I Exs. H, I). The Florida district judge granted the motion to dismiss and issued an order to show cause why class counsel should not be disbarred from practicing in the United States District Court for the Southern District of Florida. (Potter Decl. I Exs. J, K, L).

---

[2] Mr. Miller has never filed a notice of appearance in this action. However, he has defended Gruenberg at depositions and has counseled Gruenberg throughout most of the litigation.

## ARGUMENT

### POINT I.
### P&G SHOULD BE AWARDED SUMMARY JUDGEMENT AS TO LIABILITY

To prevail under Sections 32 and 43 of the Lanham Act (15 U.S.C. §§ 1114, 1125) for trademark infringement and false designation of origin, and for unfair competition under New York law, a plaintiff must demonstrate only two things: "(1) that it has a valid trademark entitled to protection under the Act, and (2) [that] defendants' actions are 'likely to cause confusion.'" *Phillip Morris USA Inc. v. Marlboro Express,* 2005 WL 2076921, at *4 (E.D.N.Y. Aug. 26, 2005) (citation omitted.); *see W.W.W. Pharmaceutical Co., Inc. v. The Gillette Co.,* 984 F.2d 567, 576 (2d Cir. 1993) ("The state law cause of action for unfair competition shares many common elements with the Lanham Act claims . . ., including proof of actual confusion to recover damages. . . ."). P&G can indisputably satisfy both of these requirements.

#### A. P&G Owns The Pantene, Pro-V and Head & Shoulders Names And Designs

P&G owns numerous incontestable federal trademark registrations for the name "Pantene" and for certain aspects of the Pantene trade dress. (Potter Decl. I Ex. M). Those trademarks include Registration No. 1,484,935 registered in the Principal Register on April 19, 1988, Registration No. 638,163 registered in the Principal Register on December 4, 1956 and renewed on December 4, 1976 and then again in 1996, Registration No. 1,005,694 registered in the Principal Register on March 4, 1975 and renewed on March 4, 1995, Registration No. 1,491,844 registered in the Principal

Register on June 14, 1988 and Registration No. 2,207,500 registered in the Principal Register on December 1, 1998. Procter & Gamble also has a pending application for the name "Pantene Sheer Volume."

Procter & Gamble is also the owner of various federal trademark registrations for certain aspects of the Pantene Pro-V trade dress. Those registrations include Registration No. 2,757,654 registered in the Principal Register on August 26, 2003 and Registration No. 2,447,036 registered in the Principal Register on April 24, 2001.

Procter & Gamble is also the owner of various incontestable federal trademark registrations for the name "Pro-V." Those registrations include Registration No. 1,822,234 registered in the Principal Register on February 22, 1994 and renewed on April 6, 2004, and Registration No. 1,719,290 registered in the Principal Register on September 22, 1992 and renewed in 2002. Procter & Gamble is also the owner of two additional federal trademark registrations for certain aspects of the "Pro-V" trade dress. Those include Registration No. 2,447,037 registered in the Principal Register on April 24, 2001 and Registration No. 2,796,187 registered in the Principal Register on December 16, 2003.

Procter & Gamble is the owner of various incontestable federal trademark registrations for the name "Head & Shoulders." (Potter Decl. I Ex. N). Those trademarks include Registration No. 729,556 registered in the Principal Register on April 3, 1962 and renewed on April 3, 1982 and then again in 2002, and Registration No. 1,653,440 registered in the Principal Register on August 13, 1991 and renewed in 2001.

Procter & Gamble is also the owner of Registration No. 2,791,735 registered in the Principal Register on December 9, 2003, which is a federal trademark registration for certain aspects of the "Head & Shoulders" trade dress.

### B. Gruenberg Knowingly Manufactured And Sold 11 Different SKUs of Counterfeit Pantene and Head & Shoulders

Counterfeit products, "'by their very nature, cause confusion.'" *Phillip Morris USA, Inc.*, 2005 WL 2076921, at *4 (citation omitted); *accord Lorillard Tobacco Co. v. Jamelis Grocery, Inc.,* 378 F. Supp. 2d 448, 455 (S.D.N.Y. 2005). "Indeed, confusing the customer is the whole purpose of creating counterfeit goods." *Gucci America, Inc v. Duty Free Apparel,* 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003). The evidence indisputably shows that Gruenberg knowingly conspired with Harrick and Chou to confuse P&G's customers into purchasing inferior quality counterfeit Pantene and Head & Shoulders hair products.

For example, by email dated August 28, 2003 concerning the "shampoos,"[3] Harrick forwarded to Gruenberg an e-mail that reads: "It is very difficult to create computer code according to the products. So, please send the master case to China for us to duplicate the computer code." (De La Cruz Aff. Ex. F).

The next month, at 12:22 p.m. on September 3, 2003, Chou asked Harrick by e-mail the following questions concerning the Pantene:

---

[3] There is no doubt which "shampoo" the email is referring to. Three weeks earlier, Harrick asked Chou to "confirm if you can make all the H&S and Pant that I send in the big box because is 6 types of each and we have like 5 containers orders coming soon but most guaranteed that you will get all 6 types same as samples I send, in the outside, the inside, the master, the inner (all the details) . . . ." (De La Cruz Aff. Ex. H).

1. How to edit the words on the first page for each type? It is different for each one.

2. The upper part of the case is cut out. There should be some words printed on it. And every case is lack of this upper part of case.

3. This page is OK, I can print the Computer code strip according the bottles.

Forty-five minutes later, Harrick forwarded this e-mail to Gruenberg. (De La Cruz Aff. Ex. G).

By e-mail dated September 16, 2003, Chou further asked Harrick: "I had received cases for shampoo. But there are still lack of upper side as previous samples. Please let me know how you like to do the words on the upper side of case – write ourselves or just empty without any words? I received 2 big master cases of Pan[tene] and H&S. They are not suitable to pack the ones we are producing. Please clarify. Please answer all the questions of cases urgently. Now we are ready to pack." Again, Harrick forwarded the e-mail to Gruenberg. This time with the note: "Tell me what to reply?" (De La Cruz Aff. Ex. A at PANAMA 189).

Twenty-four minutes later, after apparently conferring with Gruenberg, Harrick responded to Chou: "We send you all of the boxes complete, I don't understand why you say that they don't have the top. Today I send you the last missing pant case, so at this time you have all of them. I only missing 1 shampoo H&S that I am looking, but if I don't find it, you will need to make it based on the information of the product. Also, it is important to know that the Pant case are for 6 pieces and 2 cases get together, that the

2 cases makes 12 pieces but separate in 2 cases tied up both with 6 pieces each." (De La Cruz Aff. Ex. I at PANAMA 18).

Twenty-seven minutes later, Harrick wrote to Chou, "[y]ou will [truncated] to use our shampoo cases and adapt to the size. In the event that you need to print something you will need to print using the same kind of letters, changing only the description. Today, I will send you another of the missing Pantene and I will only look for the H&S I don't have until now." (De La Cruz Aff. Ex. A at PANAMA 187).

The evidence not only proves that Gruenberg knowingly manufactured the counterfeit Pantene and Head & Shoulders shampoo, it also proves that Gruenberg knowingly sold over 500,000 bottles in 11 different SKUs for distribution in the United States. (Potter Decl. I Exs. A-D).

* * *

In sum, because it is undisputed that P&G owns the trademarks for Pantene and Head & Shoulders and that Gruenberg counterfeited and sold 11 different SKUs of those products, P&G is entitled to judgment against Gruenberg as a matter of law. *See The Procter & Gamble Co. v. Quality King Distribs.*, 123 F. Supp. 2d 108, 115 (E.D.N.Y. 2000) ("'Where, as here, the goods distributed by the Defendants are intentional copies and virtually identical to the trademark owner's goods, likelihood of confusion may be established at the summary judgment stage.'") (citation omitted).

**POINT II.**
**P&G IS ENTITLED TO INJUNCTIVE RELIEF AND ENHANCHED DAMAGES AS A MATTER OF LAW**

P&G is entitled to permanent injunctive relief, $11 million in statutory damages, $5 million in attorney's fees and related investigative fees, and pre-judgment interest under the Lanham Act, and punitive damages under New York law.

**A. P&G Is Entitled To Permanent Injunctive Relief**

The Anti-Counterfeiting Consumer Protection Act provides courts with the "power to grant injunctions according to the principles of equity and upon such terms as the Court may deem reasonable to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office." 15 U.S.C. § 1116(a). To obtain a permanent injunction, a plaintiff must show actual success on the merits and irreparable harm. *See Phillip Morris USA, Inc. v. Marlboro Express,* 2005 WL 2076921, at *5 (E.D.N.Y. Aug. 26, 2005). P&G has already made both showings by proving that Gruenberg manufactured and sold counterfeit Pantene and Head & Shoulders hair care products: "[I]n this Circuit, 'proof of likelihood of confusion establishes both likelihood of success on the merits and irreparable harm.'" *Id.* (*quoting, Brennan's Inc. v. Brennan's Rest. L.L.C.*, 360 F.3d 125, 129 (2d Cir. 2004); *Genesee Brewing Co., Inc., v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir. 1997). Accordingly, P&G is entitled to an order permanently enjoining Gruenberg from further infringing its trademarks and from aiding and abetting others in the infringement of its products.



KL3 2570629.1

**B. <u>P&G Is Entitled To $11 Million In Statutory Damages</u>**

Under the Lanham Act, a court is authorized to award a trademark owner statutory damages of "not less than $500 or more than $100,000 per counterfeit mark per type of goods or services sold," except, if the "use of the counterfeit mark was willful," in which case, a court can award as much as $1,000,000 per counterfeit mark. 15 U.S.C. §1117(c). In determining the appropriate amount of statutory damages to award a Lanham Act plaintiff, courts consider the "defendant's profits from infringement, defendant's willfulness, the size of defendant's operation, defendant's efforts to mislead and conceal, and 'the deterrent effect on others besides the defendant . . . and the potential for discouraging the defendant.'" *Phillip Morris USA, Inc.*, 2005 WL 2076921, at *6 (citation omitted); *accord Nike, Inc. v. Top Brand Co.*, 2006 WL 2946472, at *2 (S.D.N.Y. Feb. 27, 2006). Each of these factors decidedly weighs in favor here of the maximum award.

Gruenberg knowingly manufactured and sold over 500,000 bottles of counterfeit Pantene and Head & Shoulders shampoo in 11 different SKUs and, after getting caught, Gruenberg destroyed evidence of his involvement and tried to coerce P&G into dropping the lawsuit. For each and all of these reasons, P&G is entitled to an award of $11 million in statutory damages. *See, e.g., Phillip Morris USA, Inc.*, 2005 WL 2076921, at *6 (awarding maximum statutory damages "[g]iven the evidence of willfulness, . . . the size of the potential profit, the large quantities of cigarettes involved, and the need for a substantial deterrent to future misconduct by [the defendant] and other similarly situated counterfeit cigarette traffickers."); *Nike, Inc.*, 2006 WL 2946472, at *2

(awarding $17 million and $21 million in statutory damages against two defendant groups, holding that "the size of the defendants' infringing operations, which led to the production of millions of infringing goods produced, the willfulness of their conduct, and their behavior in this litigation all weigh towards a grant of the maximum in statutory damages.") (collecting cases where maximum statutory damages awarded).

### C. P&G Is Entitled To Attorney's Fees and Costs

The Lanham permits courts to award attorney's fees and related investigative fees in "exceptional cases." 15 U.S.C.§ 1117(a); *see Silhouette Int'l Schmied AG v. Vachik Chakhbazian,* 2004 WL 2211660, at *4 (S.D.N.Y. Oct. 4, 2004) (holding that "[w]hile the cost of an investigator is not a 'traditional' recoverable cost (nor could it be recovered as a cost if attorney's fees were not awarded), the Court believes it appropriate here (and if necessary, could be awarded by increasing the statutory award in the same amount)."). This is just such an "exceptional" case.

Gruenberg not only "deliberately" and "willfully" manufactured and sold the counterfeit shampoo, he destroyed crucial evidence and lied to P&G about his involvement. *See Quaker State Oil Refining Corp. v. Kooltone, Inc.*, 649 F.2d 94, 95 (2d Cir. 1981) (holding that "[d]eliberate and willful" infringement justifies an award of attorney's fees.). Had Gruenberg cooperated with P&G in its investigation, P&G could have saved millions of dollars in legal and investigative fees, including the cost of obtaining and executing a seizure order in Panama.

Accordingly, P&G is entitled to an award of $3.1 million in attorney's fees and $1.9 million in related investigative costs.[4] (Potter Decl. I Exs. O, P).

**D. <u>P&G Is Entitled to Punitive Damages</u>**

In an unfair competition case, "'New York law clearly permits punitive damages, where [the] wrong is aggravated by recklessness or willfulness, . . . whether or not directed against the public generally.'" *Getty Petroleum Corp. v. Island Transp. Corp.*, 878 F.2d 650, 657 (2d Cir. 1989) (citation omitted); *accord New York Racing Ass'n, Inc. v. Stroup News Agency Corp.*, 920 F. Supp. 295, 304 (N.D.N.Y. 1996) (holding that punitive damages can be awarded in an unfair competition case, if the "defendant's conduct has constituted 'gross, wanton or willful fraud or other morally culpable conduct' to an extreme degree."). (citation omitted). Because Gruenberg knowingly manufactured and sold counterfeit Pantene and Head & Shoulders hair care products, P&G is entitled to an award of punitive damages.

---

[4] P&G is represented in this action by Kramer Levin Naftalis & Frankel LLP and Fulbright & Jaworski L.L.P., and received investigative services from Kroll. In support of this motion, P&G has submitted summary invoices only from Kramer Levin and Kroll. In the event Gruenberg objects to Kramer Levin's fees, P&G reserves the right to seek reimbursement of Fulbright's fees too. Upon request, P&G will supply the Court with detailed invoices from Kramer, Levin and Kroll, (and, if Gruenberg objects to Kramer Levin's fees), from Fulbright, for an *in camera* inspection.

## CONCLUSION

For the foregoing reasons, P&G respectfully requests that its motion for summary judgment against defendant Gruenberg be granted and that the Court permanently enjoin Gruenberg from selling Pantene and Head & Shoulders hair care products and award P&G; (i) $11 million in statutory damages; (ii) punitive damages; (iii) $5 million in attorneys' fees and related investigative costs; and (iv) pre-judgment interest.

Dated: February 1, 2007
New York, New York

Kramer Levin Naftalis & Frankel LLP

By: Geoffrey Potter
Geoffrey Potter (GP-8073)
Yehudis Lewis (YL-9974)

1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

Fulbright & Jaworski L.L.P.

Mark N. Mutterperl (MM-1977)
Jessica Parisse

666 Fifth Avenue
New York, New York 10103
(212) 318-3000

Attorneys for Plaintiff
The Procter & Gamble Company