UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE PROCTER & GAMBLE,<br><br>Plaintiff,<br><br>- against -<br><br>XETAL, INC., d/b/a APO HEALTH INC., et al.,<br><br>Defendants. | No.: 04 Civ. 2820 (DRH) (WDW)<br><br>DECLARATION OF GEOFFREY POTTER |

GEOFFREY POTTER, declares as follows, under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1. I am a Member of the Bar of this Court and am with the law firm of Kramer Levin Naftalis & Frankel, LLP, which together with co-counsel Fulbright & Jaworski L.L.P., are attorneys for plaintiff The Procter & Gamble Company ("P&G"). I submit the following declaration in support of P&G's Motion for Summary Judgment against defendant Gary Gruenberg.

2. Attached hereto as Exhibit A are excerpts from the November 18, 2005 and November 21, 2005 deposition testimony of settling defendant Dr. Jan Stahl of APO Health.

3. Attached hereto as Exhibit B are excerpts from the deposition testimony of settling defendant Alan Cohen of The Global Marketing Center.

4. Attached hereto as Exhibit C are excerpts from the deposition testimony of Gary Gruenberg.

5. Attached hereto as Exhibit D are copies of invoices for Pantene and Head & Shoulders shampoo issued by Harrick's company, ATM, Inc., to settling defendants APO Health in New York, and The Global Marketing Center in Florida. Gruenberg sold the shampoo reflected in those invoices.

6. Attached hereto as Exhibit E is a copy of an internal P&G memo dated May 28, 2004.

7. Attached hereto as Exhibit F are copies of P&G's registrations for various Pantene marks.

8. Attached hereto as Exhibit G are copies of P&G's registrations for various Head & Shoulders marks.

9. Attached hereto as Exhibit H are copies of a wire transfer from APO Health to Gary Gruenberg in the amount of $97,414.20, and an invoice for "Pantene" shampoo in the amount $97,414.20.

10. Attached hereto as Exhibit I are copies of a wire transfer from The Global Marketing Center in the amount of $61,113.60, and an email from Gary Gruenberg to Alan Cohen attaching an invoice reflecting the sale of "Pantene" and "Head & Shoulders" shampoo and a deposit in the amount of $61,113.60.

Executed this 27th day of April 2007.

Geoffrey Potter



KL3 2586873.1

EXHIBIT

A

# THE PROCTER & GAMBLE CO. VS. XETAL, INC.

## JAN STAHL - 11/18/05

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:

Ellen Grauer
COURT REPORTING Co. LLC
worldwide!
TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434 FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

Page 25

Q. When was APO Health New York formed?
A. **To the best of my recollection, mid to late eighties.**
Q. Who designated you to be the 30(b)(6) witness, the representative for APO Health here today?
A. **I guess I did.**
Q. Why did you feel you were competent to be the representative for APO Health?
A. **Because I oversee the wholesale division and I oversee the general operation of the company in New York.**
Q. What does that mean to oversee the wholesale division, what are your duties in that respect?
A. **I'm a salesman, I look to buy product and sell product and that's basically what I do. That's my -- 99 percent of my time is looking for product and selling it or finding it and assigning it to other people in my company to sell.**
Q. Going back to Exhibit number 1,

Page 26

page 1, first paragraph?
A. **This is page 1?**
Q. You're right, page 2 of the document of Plaintiff's Exhibit 1, first paragraph, do you agree with the sentence I am in charge of all operations at APO Health Inc. and I'm responsible for running the business, is that a true statement?
A. **Yes.**
Q. Is there anyone else at APO Health who you believe would have been competent to testify as to the subject matter of these actions here today?
**MR. BIALEK:** Objection as to form.
Q. Is there anyone else? You don't understand my question?
A. **I was waiting.**
**MR. BIALEK:** I can object, but that doesn't mean you don't answer. Go ahead and answer if you can. I'm just objecting as to form.
A. **Would you rephrase the question, please?**

Page 27

Q. Do you believe there's anyone else at the company who would be able to testify as to the matters at issue in both cases, the Alcoa matter and the P&G matter?
**MR. BIALEK:** Objection as to form. You can answer.
A. **Depends which aspect of the transaction you are referring to.**
Q. Is there anyone who was involved in all aspects of the transactions other than yourself?
**MR. BIALEK:** Objection to form.
A. **I was not involved in all actions of the transaction so I didn't handle each step of the transaction.**
Q. Which steps did you handle?
**MR. BIALEK:** Objection to form.
Q. Let's talk about the shampoo.
**MR. BIALEK:** Objection to form.
Q. Which parts of the shampoo transactions did you handle?
**MR. GOLDMAN:** I'll object as to form. You can answer.
A. **I was approached by Mr.**

Page 28

**Gruenberg who offered me to purchase Pantene, Head & Shoulders and then I offered that product to my two customers Quality King and to Victory and then once the purchase orders were sent to us, my aspect of the transaction was finished.**
**Other people in the APO New York corporation handled financing, payments, shipping, getting the payments from the customer, etc.**
**My only involvement in the transaction was to introduce the product to my two customers and then after that the POs come to the office and I no longer was involved with the transaction.**
Q. So is it fair to say your role with respect to the shampoo was to broker the transactions?
**MR. BIALEK:** Objection as to form.
A. **My role with the shampoo was to sell or broker the transaction, but not the entire transaction, just to make the introduction to the customer and offer to my**

Page 81

said that --
Q. Meaning Mark?
A. He being Mark that -- I'm not sure whether Mark told me or Mr. Gruenberg told me that they had done business with one of Quality King's other companies which is called pro something in Jersey and did some perfume deal or fragrance deal of some type, that's all I know.
Q. So somehow it came out, you don't know who told you, that one of Quality King's businesses had done business with Gary Gruenberg for fragrances; is that correct?
A. That's correct.
Q. The name of the company, the Quality King company is Pro something?
A. I think it's Pro Choice to the best of my recollection, but I could be wrong with that name.
Q. Did you come to learn how long Quality King had done business with Gary Gruenberg?
A. No.
Q. How soon after you had this

Page 82

conversation with Mark Jones did you contact Gary Gruenberg?
A. Either that same day or the next day. I think I left a message because I got an answering machine the first time I called I think.
Q. Then you were talking about your conversation, you identified yourself as calling on behalf of Quality King you said?
A. Yes, I told him I was introduced, they gave me your name to call that they want to purchase batteries from your company and they would like me to bring them in for them because they don't buy product from out of the country.
Q. Did Gary Gruenberg seem to be aware that you were going to be calling him?
A. Yes.
Q. Did Gary Gruenberg indicate with whom he dealt with at Quality King?
A. I believe he told me he had spoken to Mr. Jones and then that was it and when I called back he acknowledged that he had spoken to Quality and that I was the

Page 83

person who was going to call him.
Q. Did Mr. Gruenberg explain to you his relationship with ATM?
A. Mr. Gruenberg implied for the longest time that he was either ATM or a partner in ATM.
Q. How did he imply that to you?
A. Because he always referred to it as his company, the company and I just assumed that it was his company.
Q. You just had that one conversation with Mr. Gruenberg regarding the batteries or did you have follow up conversations?
A. The next conversation was probably that he was going to send me a proforma invoice for the batteries that Quality King wanted to buy.
Q. Did Mr. Gruenberg in this phone call or at any point indicate to you where ATM is located?
A. No, I only found out where batteries would be delivered to which he told me when I got the proforma invoice it said

Page 84

Curacao on it. I didn't know where their company actually was. When I got the proforma --
MR. GOLDBERG: Somebody's phone is ringing.
MS. LEWIS: Whose phone is ringing?
MR. OFFICE: This is Jim Office. It's not me, my phone is on mute.
MS. LEWIS: Gary?
MR. GRUENBERG: I'm sorry, that must have been mine.
A. I didn't know that. When I got the proforma invoice, it had the address of Curacao for ATM so that's when I assumed that ATM was in Curacao.
Q. Were the batteries ultimately sent to Quality King?
A. You have to rephrase the question, which batteries?
Q. The batteries that you were buying on behalf of --
A. The original order for the LC?

Page 85

Q. Yes.
A. **No, the LC expired and that particular transaction did not occur. Later on the batteries came in after that date and they did buy some batteries, but that particular LC expired and went back to Quality King and that deal was cancelled.**
Q. After that deal was cancelled, did you purchase additional batteries on behalf of Quality King?
A. **You have to rephrase. What do you mean on behalf of, the purchase order they gave me?**
Q. As I understood from your testimony, the first battery transaction that was ultimately cancelled you were not buying it for yourself, you were buying it for Quality King?
A. **Correct.**
Q. Then it expired or the LC expired?
A. **Correct.**
Q. Did you subsequently make a purchase of anything on behalf of Quality

Page 86

King from ATM?
A. **Sure, Head & Shoulders, Pantene and batteries.**
Q. I'm trying to draw a distinction here between what I understand the first transaction was which you were just -- in that transaction Quality King as you explained it wanted to do this deal, but didn't want to do the importing itself so they asked you to do kind of the grunt work for them so to speak?
A. **Correct.**
Q. That deal ultimately fell through because the LC expired, correct?
A. **Yes.**
Q. Did you have similar deals like the one I just described subsequent to that for any product for Quality King?
A. **Not with LCs, but with me purchasing product and selling to Quality King, yes.**
Q. In those subsequent transactions you were the seller, right?
**MR. BIALEK:** Objection.

Page 87

A. **Yes.**
**MS. LEWIS:** Let's go off the record for a second.
**THE VIDEOGRAPHER:** We're now off the record at 11:26 a.m., November 18, 2005.
**(Recess taken.)**
**MS. LEWIS:** Let's go back on the record.
**THE VIDEOGRAPHER:** We're now back on the record at 11:30 a.m., November 18, 2005.
Q. After you placed the battery order for Quality King, what was your next dealings with Mr. Gruenberg?
A. **Mr. Gruenberg offered me Head & Shoulders and Pantene.**
Q. Approximately when did he offer you those products?
A. **To the best of my recollection, sometime in late July.**
**MR. PULLIN:** Can we get a year, please?
**THE WITNESS:** Sorry, 2003.

Page 88

Q. 2003. How did he offer them to you? How did he communicate that offer to you?
A. **He asked me if there is other products we sell and I said whatever you offer me I'll offer to Quality King because you are his contact and he said do you think they buy Head & Shoulders and Pantene and I said I have no experience with that product, I've never sold it, but I'll ask them and I asked them.**
Q. So you had no dealings with Mr. Gruenberg between late May 2003, early June 2003 and July 2003?
**MR. PULLIN:** Objection to form.
**MR. GOLDBERG:** Objection to form.
**MR. BIALEK:** Join.
A. **It's possible it could be late June going back, I can't give you an exact date, but sometime after I originally met him and the time I gave him the Pantene order he offered me Pantene and Head & Shoulders and I offered it to Quality King.**

COPY

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
94 Civ. no. 2820 (DRH)
---------------------------------x
THE PROCTER & GAMBLE COMPANY,

Plaintiff,
-against-

XETAL, INC. d/b/a APO HEALTH, INC., et al.
Defendants.
---------------------------------x
04 Civ. No. 1225 (DRH)
---------------------------------x
ALCOA, INC. and REYNOLDS METALS COMPANY,
Plaintiffs,
-against-

ATM, INC.; LATIN IMPORT SRL, S.C., a/k/a LATIN IMPORT PANAMA, S.A., XETAL, INC. d/b/a APO HEALTH, INC. and UNIVERSAL MEDICAL DISTRIBUTORS, INC., et al.,
Defendants.
---------------------------------x

666 Old Country Road
Garden City, New York

November 21, 2005
9:40 a.m.

Continued Videotaped Deposition of JAN STAHL, pursuant to Notice, before Shari Cohen, a Notary Public of the State of New York.

Ellen Grauer Court Reporting, Co. LLC
126 East 56th Street, Fifth Floor
New York, New York 10022
212-750-6434
REF: 79219

Stahl

not seeing the problem.

MR. PULLIN: It's an inquiry by a third party, it's not an offer by him. It's entirely different consequences. You are using an inquiry by a third party to try and trap him into saying he offered the merchandise. It's not what this document says. It's misleading if you do that.

MS. LEWIS: I hear what you're saying. I'm not sure I agree, but I hear what you're saying. Let's bring him back in.

(Whereupon the witness returned to the room.)

Q. Did APO purchase products labeled Head & Shoulders or Pantene from anyone other than ATM?

A. No.

Q. Did APO ever offer -- prior to purchasing shampoo from ATM, did APO ever offer Purity or Head & Shoulders products?

A. No.

EXHIBIT

B

THE PROCTER & GAMBLE CO. VS. VS. INTERNATIONAL SERVICE

ALAN S. COHEN - 1/13/05

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:

Ellen Grauer
COURT REPORTING, LLC
worldwide!

133 EAST 58TH STREET, SUITE 1201, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434 FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

Page 29

business, just in a couple of sentences?

**A. I buy and sell national branded products, grocery, health and beauty, medical supplies, and sell those products to different wholesalers here and abroad.**

Q. Do you work through -- do you have a company that you work through?

**A. The company name is Global Marketing.**

Q. Do you work through any other companies or doing business names other than Global Marketing?

**A. Yes. I have the Dental Discount Center and Astra Trading.**

Q. Spell Astra Trading for me.

**A. A-s-t-r-a.**

Q. And how do you decide which transactions you will do through which company? Are the businesses separate?

**A. The dental company is mostly dental products. And 99 percent of the other business is done through Global Marketing. Astra Trading is a company I have had for a while and don't use very often.**

Q. Okay. Have you ever heard of somebody by the name of Gary Gruenberg?

**A. Yes, I have.**

Page 30

Q. How did you first have contact with Gary Gruenberg?

**A. I was introduced to Gary through an associate of mine, whose wife is somehow related to Gary's wife.**

Q. What is the name -- is it a current associate or former associate?

**A. Current associate.**

Q. What is his or her name?

**A. His name is James Davis.**

Q. And James Davis works in one of your businesses?

**A. Yes.**

Q. Of which company?

**A. Global Marketing.**

Q. What is his duty or title?

**A. He also buys and sells.**

Q. And you said that James Davis's wife is somehow related to the Gruenbergs. What is your understanding?

**A. I'm not sure of the exact relation, but Mr. Davis's wife is somehow related to Gary's wife.**

Q. Okay.

**A. Cousins or second cousins.**

Q. Gary's wife's maiden name, do you know, is

Page 31

Harrick?

**A. I'm not sure.**

Q. You don't know James Davis's wife's maiden name, by chance?

**A. No, I do not.**

Q. Do you know where James Davis lives?

**A. In Aventura.**

Q. Has James Davis ever spoken to you about Gary Gruenberg or the families or anything about do they go to holidays together? Are they still social together?

**A. I don't believe they socialize at this point.**

Q. Did they before?

**A. I don't believe so.**

Q. Do they live in the same building complex?

**A. No.**

Q. Do you know where the Davises live?

**A. I don't have the exact address.**

Q. It's in Aventura?

**A. Yes.**

Q. I only mention it because my understanding is Gary Gruenberg lives in Aventura also?

**A. Yes, he does.**

Q. Have you ever been in the Gruenberg's home?

Page 32

**A. No.**

Q. Do you know any of the Gruenberg's other relatives?

**A. No, I do not.**

Q. Do you know whether they have other relatives that live in Aventura?

**A. I'm not sure.**

Q. Was it James Davis who had the original contacts with Gary Gruenberg regarding purchasing of product?

**A. Yes.**

Q. And how long ago was that?

**A. I'm not sure of the time frame, but it was last year.**

Q. It was fairly recent? It was 2003? We are in 2005, so it would have been 2003, you think?

**A. Yeah.**

Q. We will see some documents.

**A. It's not that long ago.**

Q. The earliest documents we have with transactions at issue here are 2003.

**A. Okay.**

Q. Were there other transactions, say, regarding fragrances or other things? Because Gary has other businesses, as I understand?

Page 33

A. No. This is the first transactions that Global has done with Gary or any one of his associates.

Q. How did it all begin? What is your best recollection?

A. Gary came up to my office, we discussed a couple product opportunities that he had. He made some offers to us, we negotiated back and forth some pricing and terms. That's how it started.

Q. That was the first you met of Gary?

A. Correct.

Q. And we can look at the documents and see if it helps to pinpoint it, but we think we are talking around 2003?

A. Um-hm.

Q. What product or products was he talking to you about?

A. Originally it was Duracell batteries. He was also working on some Gillette products.

Q. Are these razors or other products?

A. Razors. The razor blades.

Q. Replacement blades for the Mach III, was it?

A. Yes. From there it went to shampoos.

Q. How about the Good News razor, was that discussed in the beginning?

Page 34

A. I believe so, yes.

Q. They never made the stems for the Mach III? The term of art is the handles. You never got handles offered that you recall?

A. You mean the disposable razors themselves?

Q. No. The disposable razors, I think, are the Good News razors. That's the one piece plastic, I guess, the world's best selling razor.

A. Okay.

Q. And the Mach III, though, it's like the all-time great, you make the money selling the blades. That big, heavy, metal handle. Was that something he offered as well?

A. I believe it was just the replacement cartridges.

Q. Okay. Did he offer any other products other than the Gillette and Duracell at that point? Was shampoo mentioned?

A. Shampoo was mentioned. I don't recall the exact timing of when these offers came up. Originally it was the batteries, then we started talking about blades, which never happened. Then we started talking about some aluminum foil and shampoo all kind of intertwined together.

Q. Did Gary explain to you how he suddenly got in this business of selling these consumer products?

Page 35

A. Originally it was a contact in Panama, which turned out to be his brother-in-law.

Q. Right.

A. That's how he got into it. He had been in the fragrance business and some other items he was trading. He started to receive these offers through his brother-in-law in Panama, and that's how he got into it.

Q. When he first met with you, did he mention anything other than he had a contact? Did he say it was his brother-in-law?

A. No.

Q. He said he had a contact?

A. Right.

Q. Did he say it was a contact in Panama?

A. Um-hm.

Q. Did he explain to you why he could get these things at good prices? Did he suggest any pricing for these products?

A. I'm not sure.

Q. Did you discuss prices in your initial conversation with him or quantities?

A. Probably in the first few discussions, we discussed the prices. It was an introductory meeting, and he can get these lines.

Page 36

Q. There is, obviously, a call with you or with James Davis to set up a meeting. He comes, meets you?

A. Correct.

Q. The guy says, "I have got a couple of products. Is this something that you might be interested in buying?"

A. Correct.

Q. And you say?

A. Sure.

Q. And then you have some subsequent, I guess, telephone calls or meetings with him?

A. Mostly phone calls. I'm sure he came by the office a few times.

Q. You never went and met him at any office?

A. I might have met him once at Scorbutus or something.

Q. I hear he uses Scorbutus as an office?

A. He does.

Q. A lot of people who work out of their home –

A. Use that as their office.

Q. That's why they can get away with charging $7.00 for a coffee.

Page 37

10:22:00 A. Right.
10:22:05 Q. To the best of your recollection, how does
10:22:07 the conversation go concerning the quantity or
10:22:10 price?
10:22:11 A. He sends offers to us via e-mail. The
10:22:16 offers came for quantities, pricing, and that's how
10:22:21 it goes.
10:22:22 Q. And what would you do with the information?
10:22:27 I mean, say he offers you, you know, I can get you,
10:22:35 let's start with, shampoo. I can get you Pantene
10:22:38 shampoo, and then he would tell you what varieties?
10:22:41 SKUs?
10:22:43 A. Correct.
10:22:44 Q. And I can get it to you in quantity, and
10:22:46 then would he give you a price as well?
10:22:50 A. He would give me a price, the SKUs he was
10:22:52 able to get, approximately how many he could order.
10:22:55 Then I would go and contact my companies that I do
10:22:59 business with to see if it works for them.
10:23:03 Q. How do you do that with price? Do you
10:23:07 suggest a price, or do you say to them what are you
10:23:09 willing to pay?
10:23:10 A. In terms of Gary?
10:23:11 Q. In terms of your customers.
10:23:13 A. It works both ways.

Page 38

10:23:17 MR. TAFT: Mr. Potter, this is Guy Taft. I
10:23:20 have just been advised by Joe Goldberg that the
10:23:23 Court has arranged for a conference call from us at
10:23:27 11:30 today to discuss this topic of taking the
10:23:36 deposition in both cases at the same time.
10:23:38 What the judge has requested is that we
10:23:42 call in with our court reporter present. We set up
10:23:47 our own conference call, which we have, and we call
10:23:51 into the judge's chambers. And he has given us a
10:23:55 telephone number to call, which I can give to you
10:23:57 now, or we can wait until 20 after.
(Discussion held off the record)
BY MR. POTTER:
10:24:16 Q. Mr. Cohen, how are you set for time this
10:24:21 afternoon? How late can you go if we have to go
10:24:25 past 5:00?
10:24:29 A. I prefer not to.
10:24:32 Q. You prefer not to, but if it's an emergency
10:24:33 you could stay, so we wouldn't have to do a second
10:24:36 trip?
10:24:37 A. Correct.
10:24:58 MR. POTTER: What was the number for
10:24:59 reaching chambers?
10:25:01 MR. TAFT: The number that we are to call
10:25:03 in –

Page 39

10:25:05 MR. POTTER: At 11:30?
10:25:06 MR. TAFT: – is 631-712-5720.
10:25:44 BY MR. POTTER:
10:25:45 Q. Mr. Cohen, do you recall which of your
10:25:48 customers you contacted about the possibility of
10:25:53 their purchasing Duracell batteries?
10:25:58 A. Grapevine Trading.
10:26:00 Q. And is Grapevine Trading Victory?
10:26:03 A. Yes.
10:26:06 Q. And how about the foil, which of your
10:26:11 clients did you contact about the possibility of
10:26:14 them buying it?
10:26:15 A. I initially inquired about pricing with
10:26:19 Grapevine also, but I do not believe they purchased
10:26:24 it from me.
10:26:29 Q. And with the shampoo products, who did you
10:26:35 speak to about an indication of price?
10:26:40 A. Grapevine.
Q. Grapevine as well.
10:27:11 To the best of your recollection, did
10:27:13 you do any research about Gary Gruenberg, or just he
10:27:18 was introduced to you by your colleague who had a
10:27:21 family relationship, and leave it at that?
10:27:23 A. That is correct.
10:27:25 Q. Did you ever ask James Davis anything about

Page 40

10:27:29 his background or anything, other than those initial
10:27:32 things, you know, he is a relative of mine?
10:27:36 A. Basically that's as far as the conversation
10:27:38 went.
10:27:40 Q. And then you had these initial conversations
10:27:48 and a meeting and some phone conversations with Gary
10:27:50 Gruenberg. Did you ever speak with anybody in
10:27:53 Panama?
10:27:54 A. Ultimately I did.
10:27:57 Q. At this ordering stage did you speak with
10:28:01 Fred Harrick or Justo Villareal or anybody?
10:28:05 A. No, I did not.
10:28:07 Q. At this time you were dealing with Gary?
10:28:09 A. Correct.
10:28:10 Q. Did you speak with his wife Sylvia at all?
10:28:15 A. Never.
10:28:15 Q. Did you speak with anyone else working with
10:28:17 him in the United States?
10:28:18 A. No, sir.
10:28:19 Q. Just with Gary?
10:28:20 A. Yes.
10:28:22 Q. What happened next?
10:28:25 A. In which particular transaction? From the
10:28:27 beginning?
10:28:28 Q. Sort of from the beginning, because these

Page 53

Q. Had you ever done business with the MultiCredit Bank before this?
A. I don't believe so, no.
Q. Have you ever heard of it before?
A. No.
Q. We are in the same shoes.
A. Okay.
Q. Do you recall what the next battery transaction was? What type of battery?
A. Similar.
Q. Was it a AA, single A battery, or a 9 volt?
A. Probably -- I don't recall. There was a 9-volt transaction that ultimately came in, and I don't recall the exact configuration of the containers as they came in. The documentation will show what it was.
Q. You did the next battery transaction --
A. Same procedure.
Q. Did you go and inspect in Curacao?
A. No, we did not. We were building a relationship with these people, and at that point I didn't feel it was necessary. They spoke to Checo and confirmed the merchandise was there, sent me a warehouse receipt, and then just continued on with the transaction.

Page 54

Q. Okay. And then, to the best of your recollection, what was the next transaction that took place?
A. I don't recall.
Q. So it was either a shampoo or a battery transaction?
A. Correct.
Q. Let's talk about the first shampoo transaction.
A. Okay.
Q. Describe that, sort of, from the beginning. Kind of take me through that.
A. The offer was made to me regarding the products, the SKUs, the pricing. I reviewed those with my contact at Grapevine, put together a couple of orders, sent the orders over to Gary/Fred, and gave them some deposits for those containers.
I think it turned out to be three containers. The mix we gave them totaled, I believe, three containers.
Q. Before you bought these, which of your customers did you speak with?
A. I spoke with my contact at Grapevine.
Q. Who is your contact at Grapevine?
A. His name is Warren Shanker.

Page 55

Q. Is Mr. Shanker in Ohio?
A. No, sir.
Q. Where is he located?
A. He is located in their Florida office.
Q. Do you know where their Florida office is physically?
A. I believe it's in Boca Raton.
Q. With the batteries, who did you speak with at Victory? Was that Warren Shanker as well?
A. Yes.
Q. Do you still do business with Warren Shanker?
A. Yes, I do.
Q. To this day?
A. Yes, I do.
Q. You still have a relationship with him?
A. Yes, I do.
Q. Do you know, does he work just for Victory or other companies?
A. I believe he works just for Grapevine.
Q. Grapevine, excuse me. Other than Victory's subsidiary Grapevine, did you speak with anyone else to see if you can get a better price for the shampoo?
A. I don't believe so, no.

Page 56

Q. Again, roughly, what was your profit margin on the shampoo, your anticipated profit margin?
A. I believe it was 15 to 20 percent.
MR. TAFT: Objection to form.
You can answer.
A. I believe it was 15 to 20 percent.
Q. When you were doing the deals, you were expecting a return of about 15 to 20 percent?
MR. TAFT: Objection to form.
A. That's correct.
Q. Before you received the first shipment of shampoo, you had made deposits on approximately how many shipments?
A. I believe there was three deposits for three separate containers.
Q. Yes. And how were these transactions supposed to work?
A. Pretty much the same way as the batteries. The merchandise was ordered, I gave the deposits, when the merchandise came in, I also paid for the balance when it arrived at the warehouse in Curacao. And I would bring them back to my warehouse in Florida, and Grapevine would make arrangements to pick them up and pay for them.
Q. So what happened with the first shipment?

Page 65

11:04:25 A. I guess.
11:04:27 Q. And the ship to is to Ian Pinar, P-i-n-a-r?
11:04:34 A. It should be Ian Pinellas, but that's close.
11:04:38 Q. It could be my eyes also. It's supposed to
11:04:42 be Ian Pinellas?
11:04:43 A. Correct.
11:04:44 Q. And Grapevine Trading, to the best of your
11:04:47 knowledge, is at 400 Victory Lane?
11:04:51 A. Yes, sir.
11:04:52 Q. In Springboro, Ohio?
11:04:55 A. That is correct.
11:04:56 Q. And what were you shipping?
11:04:59 A. This was the samples of the Pantene.
11:05:03 Q. And this is from that first order?
11:05:06 A. From the first order, yes.
11:05:08 MR. TAFT: Let me object to leading. Form.
11:05:10 Go ahead.
11:05:14 Q. And the date that you sent these is on
11:05:17 October 19, 2004?
11:05:20 A. Yes.
11:05:30 Q. And I see the total charge was $130, so you
11:05:34 must have sent several bottles, I would imagine?
11:05:38 A. I sent a few bottles. I believe probably
11:05:41 one of each. A few. I don't recall what we sent.
11:05:46 Q. You testified earlier that you sent some

Page 66

11:05:48 samples to Ian in Ohio. This is the record of your
11:05:54 having – from UPS of your having sent those
11:05:57 samples?
11:05:58 A. That is correct.
11:05:59 MR. TAFT: Object to the form and
11:06:01 foundation, although you have given me a foundation
11:06:04 objection continuing.
11:06:33 Q. Prior to receiving this shipment of Pantene
11:06:36 and Head & Shoulders, for how many years have you
11:06:40 been in the business of buying and selling consumer
11:06:45 products?
A. About 15 years.
11:06:46 MR. TAFT: Mr. Potter, have you finished
11:06:48 with Plaintiffs' Exhibit 3? I didn't want to
11:06:55 interfere with your questioning, but I did want to
11:07:00 make an objection on the record, so that it's clear
11:07:03 to you on the record while this is all fresh in our
11:07:07 minds.
11:07:09 MR. POTTER: I would rather you not
11:07:11 interrupt. You have the right to interpose an
11:07:15 objection. Again, you have preserved for trial all
11:07:20 your objections, except as to form. So I don't know
11:07:23 what your objection is. You couldn't have an
11:07:27 objection to the document that's not preserved.
11:07:30 MR. TAFT: It wasn't really for that

Page 67

11:07:31 purpose. It was just to inform you before you moved
11:07:34 on. If you don't wish me to do that, I won't.
11:07:37 MR. POTTER: Okay. Thank you.
BY MR. POTTER:
11:07:41 Q. You said you have been for about 15 years
11:07:44 in the business of buying and selling consumer
11:07:46 products?
11:07:47 A. Yes.
11:07:47 Q. As part of that you speak to many other
11:07:50 people in that business?
11:07:51 A. Yes.
11:07:53 Q. Had it come to your attention that from time
11:07:57 to time there are some counterfeit consumer goods?
11:08:01 A. Sure.
11:08:06 Q. Would it be fair to say that one of your
11:08:09 goals is to try to avoid ending up with counterfeit
11:08:13 goods?
11:08:14 A. Absolutely.
11:08:15 Q. When you received this shipment of Pantene
11:08:19 and compared it to samples from the store, sent it
11:08:24 to Grapevine, and it was rejected, was one of your
11:08:31 concerns that you may have been stuck with some
11:08:33 counterfeit product?
11:08:35 A. Absolutely.
11:08:51 Q. Now, you know that there are labs that test

Page 68

11:08:53 products for people? Are you familiar with that?
11:08:56 A. I'm sure there are.
11:08:58 Q. You didn't send these products to any labs,
11:09:00 did you?
11:09:01 A. No. When the merchandise was refused by
11:09:04 Grapevine, I called up Gary and/or Fred and
11:09:06 indicated that there was a problem with the
11:09:08 merchandise, and I wanted to return it and get a
11:09:11 refund.
11:09:17 Q. Who did you call first, Gary or Fred?
11:09:21 A. I probably called Gary. I don't recall, but
11:09:24 I probably called Gary. At that point I was
11:09:27 speaking to Fred also.
11:09:36 Q. When did you first start speaking with Fred?
11:09:38 A. Probably after the first transaction or
11:09:41 during the battery transaction.
11:09:46 Q. What were the nature of your conversations?
11:09:50 Did Fred call you, or did Gary give you Fred's phone
11:10:00 number? Did you start e-mailing? How did that
work?
11:10:00 A. I believe we started doing e-mails. And
11:10:00 ultimately I got his phone number from either him or
11:10:02 Gary, I'm not sure, and started speaking to him
11:10:05 directly.
11:10:05 Q. When did you learn that Fred was Gary's

Page 69

brother-in-law?
A. Pretty close to the beginning. I don't recall the exact dates. Pretty close to the beginning of the transactions.
Q. Do you recall your initial phone conversation with Gary when you wanted to give this product back?
A. If it was with Gary or Fred, I don't necessarily --
Q. Do you have a specific recollection of a conversation -- let's start with Gary? I want to ask you about the conversations, and I want to try to pinpoint things as best we can.
A. I remember calling either Gary or Fred. I certainly had conversations with Gary and Fred both. I don't recall who was first or second.
Q. You had a lot of money invested? For me it's a lot of money.
A. For anyone it would be a lot of money.
Q. There is more than $100,000?
A. Absolutely. I spoke to one and/or both. I don't recall who I spoke to first, but I did speak to both of them about it ultimately. If it was not Gary first, then it was Fred first, but I spoke to the other person also after.

Page 70

Q. Right.
A. In my discussions I indicated that there was a problem with the product, I needed to get rid of it. "Where do you want me to send it back to you? How do you want me to handle it? I want to make it clear that I don't want the merchandise, and I want my money back."
Q. How would you describe your demeanor in this initial conversation?
A. My demeanor, I'm assuming, was pretty calm at that point.
Q. Did you expect -- before you made the call, did you expect Gary to be surprised that there was a problem with the product?
MR. MILLER: Object to the form.
Q. Did you have any expectations as to whether Gary had known about the problem? Didn't know about the problem?
MR. MILLER: Object to the form.
A. I didn't have any expectations of whether Gary knew or Fred knew. When I spoke to them, there didn't seem to be a problem. "Okay. We will make arrangements to either sell the merchandise to someone else, if you don't want it, or you can return it to us, and we will make arrangements to

Page 71

get you some refunds."
Q. That's what you wanted to hear, right?
A. That's exactly what I wanted to hear.
Q. I'm trying to -- given how memory is, it can be difficult to do, but I'm trying to figure out which conversation you had with Gary versus which conversation you had with Fred. Was it the same conversation with both?
A. I believe the conversations were similar with both regarding my wants and desires.
Q. And had one spoken with the other by the time you got to the second person? Was your notion that Gary and Fred were talking?
A. I don't know, but I'm sure they did. I'm sure they spoke every day.
Q. That was the impression you had from dealing with them?
A. If I spoke to Gary first, great, he'd say for me to call Fred. Ultimately Fred was the ultimate source of the product.
Q. Was it your impression that one was the boss?
A. It was my impression that Fred was the boss or the source of the product, and Gary was more of the broker in the transactions.

Page 72

Q. Your sense came from what exactly?
A. Just in conversations that I had with Gary. Every time we would talk with Gary, Gary would call Fred.
Q. Gary checked with Fred, but Fred didn't check with Gary, as best you knew?
A. Pretty much.
Q. But it was your impression that Gary and Fred communicated pretty well with each other? You weren't getting different answers from one or the other?
A. That is correct.
Q. Based on your interaction, I'm not asking you to guess about things, based on your interaction, Gary seemed to know what Fred knew? One didn't say to you "don't tell the other" type of thing?
A. No. It was never don't tell the other. At times I would have to ask Gary a question, and he wouldn't have the answer, he would have to ask Fred. And if he got the answer from Fred, then he would relay it to me, or I would speak to Fred directly.
Q. As best you can tell, certainly with your interactions, there weren't any secrets being kept?
A. Correct.

Page 85

A. I do not recall that, no.
Q. Had you ever seen that kind of outer box packing from stuff that comes in from Asia before?
A. Not specifically from Asia. From time to time you deal with smaller boxes, you pack them in masters just to keep them together, because it's easier to ship and less damage occurs, but not for anything specific marked Asia.
Q. When you say "smaller boxes," would you consider a dozen box a smaller box?
A. It depends. A dozen blades are small, a dozen bottles of shampoo are big.
Q. You answered my question exactly accurately, but, obviously, I asked a bad question. A dozen box of shampoo I have held in my hand before; it's kind of heavy.
A. Correct.
Q. I go to the gym, and I can lift it easily. It's a real-sized box?
A. Correct.
Q. In your experience is that the type of large box that's put into master boxes?
A. I have never seen it that way. It didn't strike me as being unusual.
Q. There were other things that were unusual,

Page 86

but that wasn't unusual?
A. That didn't draw my attention to indicate something was wrong with the product because it was packed in master boxes. That's not what drew my attention to the issues.
Q. If you had done the sale to Victory, would you have kept the product in the master boxes when you sent it to Victory, or would you have repacked it?
MR. TAFT: Objection.
Q. What would be your practice, you think?
A. I believe I would have sent them just as I received them.
Q. Let me see if I can bring us back to this chronological point in time. We have all three containers in. We are in 2004, correct?
A. Um-hm.
Q. Do we know what month we are in about now with the three containers?
A. I guess based on this shipping document here it's October.
Q. That's when the first container is here?
A. Correct.
Q. So these come afterwards?
A. We are still probably November.

Page 87

Q. November 2004?
A. Um-hm.
MR. TAFT: I object to the form of this and to this entire line of questioning, Mr. Potter.
MR. POTTER: Okay.
Q. So what happened next? Did they ever tell you that their so called source in Puerto Rico did anything or didn't do anything? Any more conversation about that?
MR. MILLER: Object to form.
MR. TAFT: Objection to form.
A. No.
Q. What did they tell you? What transpired at that point?
A. There really wasn't too much conversation about their supplier, other than that's where their supplier was, some gentleman in Puerto Rico. They were going to contact him to arrange for a refund and where to ship the merchandise, and that's where that line of questioning went.
Q. Did they give you any paperwork about their products or anything?
A. No.
Q. Anything to try to prove anything to you?
A. No, sir.

Page 88

Q. Okay.
A. I indicated to Fred and Gary that I needed to move this merchandise out of my warehouse. So, ultimately, I was to ship the two containers that I had just received, I was supposed to ship those containers to Uruguay.
I had made arrangements to have the merchandise packed in a sea-going container and shipped them to the port to be shipped to Uruguay.
One container left. The second container was being loaded and had left my warehouse and was being brought to the port when I got a call from them, I believe it was Fred, not to ship that container to Uruguay, but to bring it back, because they had a customer who was going to buy it. I said, "I will see if I can do that for you."
I didn't want to bring it back to my warehouse. So I indicated that I would make arrangements for them to put the merchandise in an outside warehouse facility that they would have to pay the storage and handling on.
Q. They hadn't paid you any storage and handling?
A. No. They haven't paid me anything.
Q. Right.

Page 137

indicated to him that I would take one of the razor containers, and maybe even sent them a deposit on those, on the one razor container. I must have taken a credit back at a later date when he never produced them.

Q. Because you never got any razors?

A. Correct. I never got any razors.

Q. And that was the Mach III cartridge blades?

A. It was either the Mach III or the Good News. And then he wanted to know if I had an interest in the one hair care container.

MR. POTTER: How are we with the videotape?

THE VIDEOGRAPHER: Half hour.

MR. POTTER: You are the most important person as the witness. It's 1:00. We can go for a few more minutes, we can break now.

THE WITNESS: I prefer to keep going.

MR. POTTER: Unless somebody is uncomfortable, someone let me know. You are the most energetic person in the room, frankly. You are doing very well. I am perfectly happy going. I just don't want to be accused of holding you --

THE WITNESS: Hostage.

MR. POTTER: -- hostage, because you are not. If you ever need a break for anything, just

Page 138

let me know, and we will break.

BY MR. POTTER:

Q. Let's look at what's been marked for identification as Exhibit 8. It's an e-mail followed by what's labeled a proforma. The e-mail is dated Thursday, October 30, 2003, 12:39 p.m. What do we see -- it appears to be an offer for shampoo. What do we have going on here?

A. It's a proforma from them that indicates on the e-mail that the proforma is a sample from another customer. Basically those are the items, the SKUs, the quantities, and the price.

Q. Is he trying to sell you what another customer was willing to buy and is just giving you --

A. Giving me a guide to the items and the mix and so forth.

Q. And do you remember doing anything with this information?

A. I assume I took the item mix, forwarded it to my client that's the items that were available.

Q. Being Grapevine?

A. Grapevine. And after that they had sent me a breakdown for a couple containers.

Q. Now, if you turn to the third page of the

Page 139

exhibit, it's an e-mail dated Thursday, November 6, 2003, at 1:54 p.m. Do you have that in front of you?

A. I see that, yes. That looks like it was a response from an earlier e-mail that I had sent him. It's right underneath that.

Q. Which is the October 30th e-mail?

A. November 30th, if you look in the middle of the page.

Q. You are correct. We have 11:47?

A. He had replied.

Q. The reason that I have these pages together is the last reply at the bottom of the page, I think, is the first page of the exhibit. This is all part of that same e-mail trail. It's got the same 12:39 October 30th?

A. Exactly.

Q. So you went to Victory's subsidiary Grapevine, and they gave you purchase orders, and then you conveyed that information in the November 6, 2003, e-mail at 11:47?

A. Correct.

Q. He was getting back to you saying that that adds up to three containers?

A. Correct.

Page 140

Q. I don't want to speculate, because there could have been a lot of other negotiations and things, are those generally the three containers that you put the deposits for and that showed up --

A. Yes.

Q. -- and that were part of it? So this is, sort of, the genesis of your going forward with those three containers?

MR. TAFT: Object to form.

A. Correct.

Q. Exhibit 9 is just a copy of that same proforma, so let's skip to Exhibit 10. We have an e-mail dated Wednesday, November 19, 2003, at 9:59 a.m. that says, "Here attached is the corrected proformas for batteries and shampoo, as we discussed."

So I guess you had also at some point -- I don't have the battery one here. I have a proforma for the shampoo, though.

A. Okay.

Q. And you see a total price of $305,000?

A. Yes.

Q. Is that your recollection, is that what you had agreed upon?

MR. TAFT: Objection to form.

Page 141

A. I believe so.
Q. And you had put down a 20 percent deposit?
A. That was the agreement.
Q. And you, in fact, wired the deposit, I think we will see?
A. Correct.
Q. And your price was either -- was $24 a dozen for the Pantene?
A. Yes.
Q. Does that sound right?
A. That's what this proforma shows, correct.
Q. Apart from this proforma, I guess that's what you intended to pay for it?
A. Correct.
Q. And for the Head & Shoulders it was an additional 48 cents, so it was $24.48 a dozen?
A. That is correct.
Q. Do you recall what your price to Victory was for these products? Was it approximately in the 30s?
A. I'm not sure. I'm sure we have it.
Q. We know your price to --
A. Maybe $31 or $32.
Q. $31 to $32. Your price to Tops was $31, correct?

Page 142

MR. TAFT: Object to form.
A. Yes.
Q. So if you gave Tops -- if it was $31, and you gave Tops a $7 rebate, you did actually sell it to him for your purchase cost?
A. That's correct.
Q. Let's look at Exhibit 11. Could you turn to Exhibit 11 in your book; it has the production number GRUSEIZ 01976. This was not a document that you produced; it's a document that was seized from Gary Gruenberg's home.
This appears to be a Washington Mutual Bank wire transfer record addressed to Sylvie, S-y-l-v-i-e H. Gruenberg, G-r-u-e-n-b-e-r-g, and Gary Gruenberg; I gather because it's their joint account.
It shows a deposit, a wire deposit, from the originating party, being The Global Marketing Center, Inc., for $61,113.60. Am I reading that correctly, Mr. Cohen?
A. I believe so, yes.
MR. TAFT: For the record, I don't believe a copy of that has ever been provided to us in this case. You can correct me if I'm wrong, but I don't have any record of it.

Page 143

MR. POTTER: We will e-mail you a set of those documents as well.
MR. TAFT: Thank you. Just so the record is preserved, I object to proceeding with the deposition or proceeding with any of those documents since they haven't been provided to us, but go ahead.
BY MR. POTTER:
Q. Now, you would agree if we look at the proforma on Exhibit 10, that the amount that you show wired here is exactly the 20 percent deposit to the penny?
A. Yes.
Q. $61,113.60, correct?
A. Yes.
Q. So from that would you deduce that, in fact, this proforma that's marked as part of Exhibit 10 is, in fact, the proforma that was for your order?
A. Yes.
Q. Let me ask you a question. When was the last time you spoke to Gary Gruenberg?
A. Probably a month or so ago.
Q. What did you talk about?
A. We talked about getting my refund for the monies that they still owe me, about trying to set

Page 144

up a meeting with Fred to go down to Panama to try to come up with some sort of solution to this problem. We talked about just the issues at hand.
Q. Did you discuss with him the fact that he was the subject of a lawsuit?
A. Yes. He knew I was subpoenaed to produce documents. He knew I was going to be giving a deposition in the case.
Q. Did he give any suggestions to you as to what you should produce or what you should say at your deposition?
A. He did not give me any indication or suggest that I give him anything, what I should produce or not produce.
Q. I'm not suggesting you would have listened to him.
A. No.
Q. Please don't --
A. He did ask me, you know, what I would say regarding him. I said, "Well, tell the truth. What happened, who I spoke to, and who I deposited monies with. And you did receive some monies, and you requested I send deposits to you, which I did. And my discussions will bear out whatever we discussed, that's what's going to come out."

Page 185

Ocean Services Limited. It's a one-page document. Does this look like the bill of lading --
A. Yes, it is.
Q. -- for shipping that second order of shampoo from Curacao to you?
A. Correct. Dated March 3rd.
Q. That would be consistent with the payment date, too, and consistent with the purchase order date.
A. Here's what it was, right here. If you go to Exhibit 27, on those second and third containers, it looks like I had just purchased the Pantene, not the Head & Shoulders, because there may have been a dating issue with the Head & Shoulders again.
Q. Right.
A. So he invoiced me just for --
Q. So you are looking now at Exhibit 27?
A. Correct. This is the $43,200 number, which is for the Pantene and not the Head & Shoulders.
Q. For two SKUs of that?
A. Correct.
Q. Then if we turn to 244C, I have a note to myself to ask you what happened to the Head & Shoulders?
A. I made a note that I paid the 43,200 for

Page 186

those first two items. I did not take the Head & Shoulders.
Q. It was the dating issue?
A. Because it was the dating issue.
Q. And you didn't receive this Head & Shoulders into your warehouse either, did you?
A. I'm not sure.
Q. If you look at the next Exhibit 28, from the third shipment --
A. I don't see a Receiving Report.
Q. I don't either. The second page of Exhibit 27 is a receiving record.
A. On 27?
Q. Yes.
A. There is for the 900 and 900, correct.
Q. So we don't know what happened to that Head & Shoulders?
A. Correct.
Q. So we are missing 3000 cases of Head & Shoulders?
A. Correct.
Q. Can we see from the bill of lading if it came?
A. It wouldn't say. It's very generic. It says one 40-foot container.

Page 187

Q. So we can assume from the fact that the Receiving Report doesn't include the Head & Shoulders that it didn't come to your warehouse?
A. I would assume that.
MR. POTTER: Mr. Taft, we are not taking a break. The witness wanted a cup of coffee, so we are giving him a second to get it.
Q. If you could turn to Exhibit 29, that shows a wire to Gary Gruenberg for $61,113.60.
A. That's the first one I think we sent him.
Q. That's your record of the initial deposit, which is the deposit for the three shampoo shipments?
A. Correct. That went to him directly, which we looked at earlier.
Q. Right. Got it. Now I understand.
Now, if you could look at Exhibit 30, it appears to be a Xerox of a note, "Sean, new B/L for Curacao shipment. The product is in the boat. EAT 3/12/04. Customs is allowing the product in. Martha."
A. Okay.
Q. Martha. So this is a note --
A. From Martha to Sean on probably the second or third shipment.

Page 188

Q. Sean at TCS?
A. Sean at Trans Customs.
Q. Trans Customs Services. I'm sorry, I was abbreviating.
A. Correct.
Q. And so he was going to be your broker on this?
A. Correct.
Q. And Customs is allowing the product in, what does that mean?
A. Maybe we entered some preclearing documents, and Customs allowed it without an inspection.
Q. And we are looking at Exhibit 30, and there is a second page, which is a fax transmittal sheet, to Sean from Martha. It's in Spanish, though.
A. Okay.
Q. Do you speak Spanish?
A. I don't.
Q. This is contact Angel Roman. Martha does, I guess?
A. Yes.
Q. What's the following page?
A. Looks like some entry documentation.
Q. For Global Marketing?
A. It has to be submitted to Customs.

The indisputable evidence not only proves that Gruenberg knowingly conspired with Harrick to manufacture the counterfeit Pantene and Head & Shoulders shampoo, but that he knowingly sold over 500,000 bottles in 11 different SKUs to defendants APO and Global (Potter Decl. Exs. A-D), and that he personally received payment in excess of $150,000 for at least some of those unlawful sales (*id.*, Ex. B at 140-43, 187; Ex. H, Ex. I).

* * *

In sum, because it is undisputed that P&G owns the trademarks for Pantene and Head & Shoulders and that Gruenberg counterfeited and sold 11 different SKUs of those products, P&G is entitled to judgment against Gruenberg as a matter of law. *See The Procter & Gamble Co. v. Quality King Distribs.*, 123 F. Supp. 2d 108, 115 (E.D.N.Y. 2000) ("'Where, as here, the goods distributed by the Defendants are intentional copies and virtually identical to the trademark owner's goods, likelihood of confusion may be established at the summary judgment stage.'") (citation omitted).

**POINT II.**
**P&G IS ENTITLED TO INJUNCTIVE RELIEF AND**
**ENHANCED DAMAGES AS A MATTER OF LAW**

P&G is entitled to permanent injunctive relief, $11 million in statutory damages, $5 million in attorney's fees and related investigative fees, and pre-judgment interest under the Lanham Act, and punitive damages under New York law.

**A. P&G Is Entitled To Permanent Injunctive Relief**

The Anti-Counterfeiting Consumer Protection Act provides courts with the "power to grant injunctions according to the principles of equity and upon such terms as

EXHIBIT

C

THE PROCTER & GAMBLE CO. VS. XETAL, INC.

GARY GRUENBERG - 1/19/05

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:

Ellen Grauer
COURT REPORTING, LLC
worldwide!

133 EAST 58TH STREET, SUITE 1201, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434 FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

Page 13

that you did understand my question.
(CELL PHONE INTERRUPTION)
Q. Would you state your name for the record.
A. **Gary Gruenberg.**
Q. And do you currently reside at 1000 Williams Island Boulevard, apartment 1009?
A. **Yes.**
Q. And that's in Aventura, Florida; correct?
A. **Yes.**
THE VIDEO OPERATOR: Mr. Potter, could you move the laptop in front of you a little bit?
Thanks. Sorry about that.
BY MR. POTTER:
Q. And what do you do for a living?
A. **Main business is Internet sales of perfumes.**
Q. And what other businesses do you have?
A. **Currently none.**
Q. And is there a time that you worked with your brother-in-law Fred Harrick in the sale of consumer products?
A. **Yes.**

Page 14

Q. And when did that end?
A. **That ended in August.**
Q. August of 2004?
A. **Correct.**
Q. This past August.
A. **Yes.**
Q. Why did it end?
A. **Well, I was served with a lawsuit from those consumer goods companies.**
Q. And why did that lawsuit cause you to stop doing business with your brother-in-law?
A. **I figured I was in trouble, and I would take a break and see what's happening.**
Q. Could you list for me the products you -- the products that you were involved with selling, with your brother-in-law Fred Harrick.
A. **Since twenty years ago, or in this --**
Q. Well, why don't we -- why don't we say the last two years. Is that an appropriate time period?
A. **Okay.**
Q. So we'll talk about what you sold with him the last two years, what the products were.
A. **I sold with him hair care products.**
Q. And when you say "hair care products,"

Page 15

does that include the Pantene brand hair care products?
A. **Yes.**
Q. And Head & Shoulders?
A. **Yes.**
Q. What other brands?
A. **That's it.**
Q. What other products?
A. **Aluminum foil.**
Q. And you say "aluminum foil." Is that aluminum foil that carried the Reynolds brand on it?
A. **That's correct.**
Q. What other products?
A. **Finally, Duracell batteries.**
Q. And what varieties of Duracell batteries? 9-volts? Triple A's? Double A's? All three of those?
A. **All three of those.**
Q. Any other variety of the batteries?
A. **Not that -- well, not that -- not that was delivered. But there were other varieties.**
Q. And those other varieties were offered by Fred?
A. **Well, it was offered by ATM through Fred.**
Q. And what other varieties were offered?
A. **If I recall correctly, it was the C batteries, and the D batteries, and there were some others that I wasn't -- I'm not really familiar with.**
Q. What other products?
A. **Those were all the products that we sold.**
Q. Okay. Did you attempt to sell any other types of products during that time period?
A. **Yes, we did.**
Q. And what products were those?
A. **We had, let's say, been offered products by Scotch Tape company.**
Q. That would be 3M products?
A. **I would think so, 3M.**
Q. But it was tape?
A. **Scotch Tape, and other types of products in there. They have a very expansive catalog. There were other products.**
Q. Post-It notes, for example?
A. **I don't remember exactly. They were like sponge-type products and things of that nature --**

Page 16

Page 21

Q. Did you get any samples?
A. Never got a sample.
Q. What other products?
A. We were offered razor blades, replacement blades.
Q. Would this be Gillette blades?
A. Gillette.
Q. Is that the Mach III cartridge or a different model?
A. The Mark III -- Mach III cartridges.
Q. The handles or just the cartridges?
A. Both. We got an offering for a disposable ten-pack.
Q. And that would be the Good News?
A. The Good News --
Q. Or the Presto Barber? Is that --
A. No, I think it was Good News, the lower end line.
Q. Did you get samples of both of those?
A. Never got -- yeah, I got some samples of the Mach IIIs. They were sent to us. And I was going to forward them to some clients that were interested.
Q. Yes.
A. And one of the clients told me to take

Page 22

a shave with one of them, so I opened up a package, I took a shave, and it was determined that it didn't shave my face.
Q. Ouch.
A. Ouch.
Q. Which client was that?
A. It was -- if I recall correctly, it was Global.
Q. And who was that at Global?
A. Alan Cohen.
And also I was talking to APO about Mach IIIs also. Everybody wanted Mach IIIs. Replacement cartridges.
Q. Was there anybody else that you talked to about the possibility of purchasing the -- of selling and purchasing -- of you selling the razor blades, or razors?
A. Oh, there may have been other companies. I don't recall exactly who, that I offered them.
Q. Do you still have any of the samples?
A. No.
MR. TAFT: Was that a yes or a no?
THE WITNESS: That's no.
BY MR. POTTER:

Page 23

Q. What -- when you shaved, and -- is it correct to say that you determined that the blade wasn't any good?
A. (Nodding head)
Q. Is that a fair statement?
A. That's correct.
Q. Did you discuss that fact with Fred?
A. Yes.
Q. And what did he say?
A. To scratch the project; that they weren't interested in it. And I proceeded to call APO, and also Global, and told them that the merchandise is no good.
Q. And when you spoke to APO, who did you speak with there?
A. I would speak to Jan Stahl.
Q. And did you tell Jan Stahl why the product wasn't any good?
A. Yes.
Q. Did Fred tell you from where he obtained the razor blades?
A. In the case of the Mach IIIs ... I think he received the blades from a company in Germany, and possibly a company in Holland, also.
Q. And what quantity of the blades did you

Page 24

understand would have been available to you if you had decided to do business in it?
A. What was available at that time was a half a container.
Q. Of the cartridges? Or of the Mach III -- of the Mach III cartridges?
A. Of the cartridges, yeah, the Mach III cartridges --
Q. So it was just that limited half container?
A. That's correct. At the moment.
Q. And how about for the disposable Good News razors? What was the quantities?
A. It was available in one container.
Q. And you understood this to be a -- a so-called one-shot deal, that there was a container available?
A. I don't know if it was a one-shot deal, but at that moment, there was one container available for sale.
Q. Do you know if Fred Harrick sold the razors or the blades to anybody else?
A. I don't know.
Q. What other products did you attempt to sell?

Page 65

**A. Kahl Food --**
Q. Probably mispronounced.
**A. Could there be another name or so? Or a different name?**
Q. Could be. Could be.
**A. I'm not really familiar with them, but I -- you're showing me a letter. It could have been one of many. Yeah.**
Q. Was it your understanding that, when something like a purchase order needed to be created, that the actual hand work was done by an associate of Fred Harrick's?
**A. Yeah, the invoicing was done by Justo.**
Q. Is it Justo or Husto [phonetic]? I don't know how to pronounce his name.
**A. I think there's two. Justo and Husto [phonetic].**
Q. Is Justo's last name Villareal?
**A. No, I never heard of that.**
Q. Is it Husto [phonetic] Villareal, or do you just know them as Justo and Husto [phonetic]?
**A. I know one is Villareal, and one is Villnova.**
Q. Villareal, and Villnova, and Justo and Husto [phonetic]. That's going to confuse me to

Page 66

no end --
**A. Yeah, that's the way it is --**
Q. I'll try and -- [inaudible]
**MR. POTTER:** I'm going to ask the court reporter to mark as Exhibit 25, again -- excuse me, I'm going to ask the court reporter to mark as Exhibit 18, excuse me, a one-page document without production number, an e-mail from Latin Imports to AMG at cruise4you@Earthlink.net, dated 25 July 2003, forwarding an e-mail from Fragrance to Latin Import dated July 24th, 2003.
**(DEPOSITION EXHIBIT 18 MARKED FOR IDENTIFICATION)**
**MR. TAFT:** Geoff, who is Latin Import? Is that ATM?
**MR. POTTER:** Yes. But I'll ask the witness that question to help clarify for you.
**BY MR. POTTER:**
Q. Latin Import is a -- would it be fair to say, a sister company of ATM?
**A. I'm sorry?**
Q. Would it be fair to -- Latin Import is a company that is operated by Fred Harrick?

Page 67

**A. Latin Import is operated by Fred Harrick.**
Q. And ATM is a company operated by Fred Harrick as well; correct?
**A. Not that I know. ATM is supposed to be another company that Fred is affiliated with some other people.**
Q. Okay. Are you familiar with the e-mail address LatinImport@cwpanama.net?
**A. I'm familiar with that.**
Q. And that's an address at which Fred Harrick can be reached at; is that correct?
**A. That's correct. Uh-huh.**
Q. And cruise4you@earthlink.net is an e-mail address that you recognize as your e-mail address; is that correct?
**A. That's correct.**
Q. Have you had a chance to look at Exhibit 18?
**A. Let me see. (Perusing document) Yes. Uh-huh.**
Q. The July 24th e-mail at 3:24 P.M. says, quote, "Another thing I noticed which has to be fixed. On the sample I received, the printing on the front side is raised on top of the box, and

Page 68

the other is embossed. I will send you the box to make sure someone really looks and makes the corrections."
**A. Okay.**
Q. And then the next e-mail says -- that's the one dated July 25th, with the "Re: Forwarding package" as the subject line, "Gary, send me two sets of T-H," which I assume is "the," two sizes."
**A. This was sent to where? To cruise4you?**
Q. Correct.
**A. Well, cruise4you is an e-mail site that I get, maybe, 300 spam mails a day.**
Q. Uh-huh.
**A. And I usually never even look at the e-mails from cruise4you. I delete all of them. It's just one of those problems about having an e-mail that I'm receiving spam every day.**
Q. Do you recall issues regarding -- regarding the printing on the front side of a box, and on top of a box?
**A. The only thing I remember, in any correspondence, is Fred was -- had some contracts with supermarket chains, and he was having some products made. And with his name on it, with Harrick. The name Harrick on it.**

THE PROCTER & GAMBLE CO. VS. XETAL, INC.

GARY GRUENBERG - 1/20/05

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:

Ellen Grauer
COURT REPORTING, LLC
worldwide!

133 EAST 58TH STREET, SUITE 1201, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434 FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

Page 112

Q. There isn't anyone else at APO that you dealt with?
MR. BIALEK: Objection.
**A. Not in regards to that.**
Q. Did you have any understanding as to why Reynolds aluminum would sell aluminum foil to Fred Harrick at a lower price than Jan Stahl could get it from Reynolds?
MR. MILLER: Object to form.
**A. From what I understand, Reynolds was not selling to Fred Harrick. Reynolds was selling to a distributor that had the rights to sell on the islands and the Caribbean, and that through that association, Fred Harrick had a relationship where he was offered this kind of merchandise.**
**Because we had this request by Jan, who is more experienced than I am in this business, he had a concern about the packaging of the product, I stressed that point.**
Q. Did Jan make a request for heavy-duty aluminum foil or regular-duty aluminum foil? Do you know what I mean when I say "heavy-duty aluminum foil"?
**A. No, he didn't make a request. We were offered a variety of those products to sell, maybe**

Page 113

**six or eight varieties of those products to sell. He chose what he wanted to buy.**
Q. You also sold aluminum foil to Mr. Cohen at Global, correct?
**A. He put a deposit for some aluminum, but he didn't take delivery on it.**
Q. But he saw a sample of the aluminum foil that he put a deposit on, hadn't he?
**A. Not from me. I never received any samples.**
Q. Didn't he tell you -- didn't Mr. Cohen tell you that he would not accept delivery of the aluminum foil, because he had looked at it and found a problem with the aluminum foil?
MR. MILLER: Object to the form.
**A. He never told me that. What he did tell me was that the price was too high for his customer at the end, and he didn't want to take delivery on that product.**
Q. So your testimony is the reason Mr. Cohen didn't take delivery of the aluminum foil is because the price was too high?
MR. MILLER: Object to the form. He just answered the question.
You can answer it again.
**A. That's correct.**

Page 114

Q. So if Mr. Cohen testified that he rejected the aluminum foil because he opened it up and saw there was a problem with it, that it was probably counterfeit, he would be lying?
MR. MILLER: Object to the form.
You can answer the same question again.
**A. I'm going to say that he didn't tell me that statement. And if he thought it was counterfeit, I would think he wouldn't continue buying merchandise from us, which he continued to do. So...**
Q. So your testimony is that after Mr. Cohen rejected the foil, he still continued to buy other products from you?
MR. MILLER: Object to the form.
You can answer it again.
**A. He did continue to buy merchandise, yes.**
Q. And those other products are the Head & Shoulders and Pantene hair care products?
**A. Yes.**
Q. Any other products?
**A. Also batteries.**
Q. And batteries?
**A. Yes, that's correct.**
Q. Let me, with the patience of your counsel, so I'm certain the record is clear, did Mr. Cohen

Page 115

tell you at any time that he rejected or was going to reject the aluminum foil because there was a problem with the foil?
MR. MILLER: I will -- continuing objection.
You can go ahead and answer the question.
**A. No.**
MR. POTTER: I'm going to ask the court reporter to mark as Exhibit 49 a one-page document, an e-mail from Latin Import to AMG, dated June 18, 2003, at 12:38 p.m.
**(Document marked as Gruenberg Exhibit 49 for identification)**
MR. TAFT: What was that date again?
MR. POTTER: June 18, 2003, Exhibit 49.
MR. MILLER: Once again, so the record reflects, I'm going to make a request for the headers. This appears to be a forwarded e-mail, and from the appearance of this exhibit, we can't tell from where it's been and where it's going. With that proviso, go ahead and ask.
MR. POTTER: Okay.
Q. Do you recall communicating with Fred Harrick regarding Head & Shoulders and Pantene in a 400-milliliter size?

EXHIBIT

D

ATM, inc (Curacao)
Willemstad, Curacao
Tel. 599-9-8339219 Fax 599-9-8339218

Invoice # 244

# INVOICE

Client
Name GLOBAL MARKETING
Address
City
Phone

Date 25-Nov-03
order #

| Qty. Doz | Description | Doz. Price | Amount |
|---|---|---|---|
| 1,200 | PANTENE PRO V 80878 00448 SMOOTH & SLEEK 13.5 OZ | 24.00 | 28,800.00 |
| 900 | PANTENE PRO V 80878 00449 COLOR REVIVAL 13.5 OZ | 24.00 | 21,600.00 |
| 900 | PANTENE PRO V 80878 00450 SHEER VOLUME 13.5 OZ | 24.00 | 21,600.00 |
| 600 | PANTENE PRO V 80878 00451 HYDRACURLS 13.5 OZ | 24.00 | 14,400.00 |
| 1,200 | PANTENE PRO V 80878 00452 CLASSIC CLEAN 13.5 OZ | 24.00 | 28,800.00 |
| 1,200 | PANTENE PRO V 80878 00453 CLARYFYING SHAMPOO 13.5 OZ | 24.00 | 28,800.00 |
| 1,200 | HEAD & SHOULDER 37000 33799 CLASSIC CLEAN 13.5 OZ | 24.48 | 29,376.00 |
| 1,200 | HEAD & SHOULDER 37000 33802 SMOOTH & SILKY 13.5 OZ | 24.48 | 29,376.00 |
| 1,200 | HEAD & SHOULDER 37000 33803 EXTRA FULLNESS 13.5 OZ | 24.48 | 29,376.00 |
| 1,200 | HEAD & SHOULDER 37000 33804 REFRESH 13.5 OZ | 24.48 | 29,376.00 |
| 1,800 | HEAD & SHOULDER 37000 33805 DRY SCALP CARE 13.5 OZ | 24.48 | 44,064.00 |
| 12,600 | | | |

Payment Detail pago
- ● Cash
- ○ Letter of Credit
- ○ Other

Name
Number
Expire

| | |
|---|---|
| SUBTOTAL | $305,568.00 |
| (-) DEPOSIT | 61,113.60 |
| TOTAL | $244,454.40 |

*Import & Export*

*World Commerce*

ATM, inc
Willemstad, Curacao
Tel. 599-9-8339219 Fax 599-9-8339218

Invoice # 213

# INVOICE

Client
Name APO Health
Address 3590 Oceanside Road
City Oceanside, NY 11572
Phone Att. Dr. Jan Stahl

Date 30-Oct-03
order #

| Doz. | Description | codes | Price | Amount |
|---|---|---|---|---|
| 1,614 | Pantene Shampoo 8087800448 | PAN 448 13% 20% | 23.40 | 37,767.60 |
| 1,653 | Pantene Shampoo 8087800449 | 449 " | 23.40 | 38,680.20 |
| 896 | Pantene Shampoo 8087800450 | 450 " | 23.40 | 20,966.40 |

Mr 14998 — ENT'D NOV 0 4 2003

SUBTOTAL $97,414.20

TOTAL $97,414.20

Payment Detail pago
◉ Cash
○ Credit
○ Other
Name
Number
Expire

Import & Export

World Commerce

ATM, inc
Willemstad, Curacao
Tel. 599-9-8339219 Fax 599-9-8339218

Invoice # 237

# INVOICE

Client
Name APO Health
Address 3590 Oceanside Road
City Oceanside, NY 11572
Phone Att. Dr. Jan Stahl

Date 18-Nov-03
order #

| Doz. | Description | Price | Amount |
|---|---|---|---|
| 590 | Pantene Shampoo 8087800450 | 23.40 | 13,806.00 |
| 596 | Pantene Shampoo 8087800451 | 23.40 | 13,946.40 |
| 804 | Head & Shoulder Shampoo 3700033803 | 23.88 | 19,199.52 |
| 2,096 | Head & Shoulder Shampoo 3700033804 | 23.88 | 50,052.48 |
| 4086 | 9801 001097 | | |

PACKING DETAIL: 4 doz. Per carton
Carton 001-147 147 cartons Pantene 808700450
Carton 148-297 149 cartons Pantene 808700451
Carton 298-499 201 cartons Head & Shoulder 3700033803
Carton 500-1024 524 cartons Head & Shoulder 3700033804

PACKING DETAIL: 2 doz. Per carton
Carton 1025-1025 1 carton Pantene 808700450

FDA product
53EY-06

SUBTOTAL $97,004.40

TOTAL $97,004.40

Payment Detail pago
◉ Cash
○ Credit
○ Other
Name
Number
Expire

*Import & Export*

*World Commerce*

Loaded

**ATM, inc**
**Willemstad, Curacao**
**Tel. 599-9-8339219 Fax 599-9-8339218**

Invoice # 238

# INVOICE

Client

Name: APO Health
Address: 3590 Oceanside Road
City: Oceanside, NY 11572
Phone: Att. Dr. Jan Stehl

Date: 18-Nov-03
order #

| Doz. | Description | Price | Amount |
|---|---|---|---|
| 1,716 | Head & Shoulder Shampoo 3700033805 | 23.88 | 40,978.08 |
| 920 | Head & Shoulder Shampoo 3700033803 | 23.88 | 21,969.60 |
| 888 | Head & Shoulder Shampoo 3700033799 | 23.88 | 21,205.44 |
| 624 | Head & Shoulder Shampoo 3700033802 | 23.88 | 14,901.12 |
| 4148 | 9801001097 | | |

PACKING DETAIL: 4 doz per carton

| | | |
|---|---|---|
| Carton | 001-429 | 429 cartons Head & Shoulder 3700033805 |
| Carton | 430-660 | 230 cartons Head & Shoulder 3700033803 |
| Carton | 661-883 | 222 cartons Head & Shoulder 3700033799 |
| Carton | 884-1040 | 156 cartons Head & Shoulder 3700033802 |

FDA product
53EY06

SUBTOTAL $99,054.24

TOTAL $99,054.24

Payment Detail pago

- ● Cash
- ○ Credit
- ○ Other

Name
Number
Expire

*Import & Export*

*World Commerce*

1B

ATM, inc
Willesmtad, Curacao
Tel. 599-9-8339219 Fax 599-9-8339218

Invoice # 249

# INVOICE

Client
Name: APO Health
Address: 3590 Oceanside Road
City: Oceanside, NY 11572
Phone: Att. Dr. Jan Stahl

Date: 15-Dec-03
order #

| Doz. | Description | Price | Amount |
|---|---|---|---|
| 1,416 | Head & Shoulder Shampoo 3700033802 | 23.88 | 33,814.08 |
| 1,092 | Head & Shoulder Shampoo 3700033799 | 23.88 | 26,076.96 |
| 698 | Pantene PRO V 80878 00452 Classic Clean | 23.40 | 16,333.20 |
| 604 | Pantene PRO V 80878 00453 Clarifying Shampoo | 23.40 | 14,133.60 |
| 2 | Pantene PRO V 80878 00453 Clarifying Shampoo | 23.40 | 46.80 |
| 3,812 | | | |

Mfr
Proctor
Gamble

9801 00 1097
FDA product code
53 EY-06

9801.00.1097 – Free

SUBTOTAL $90,404.64

TOTAL EV- $90,404.64

Payment Detail pago
- [x] Cash
- [ ] Credit
- [ ] Other

Name
Number
Expire

*Import & Export*

*World Commerce*

Jan 26 04 03:20p JStahl APO Health 516 763 5631 p.3

1C

**ATM, inc (Curacao)**
Willemstad, Curacao
Tel. 599-9-8339219 Fax 599-9-8339218

Invoice # 208B-CF-

# INVOICE

Client
Name APO HEALTH
Address
City
Phone

Date 22-Jan-04
order #

| Qty. Doz | Description | Doz. Price | Amount |
|---|---|---|---|
| 900 | PANTENE PRO V 80878 00450 SHEER VOLUME 13.5 OZ | 23.40 | 21,060.00 |
| 40 | PANTENE PRO V 80878 00451 HYDRACURLS 13.5 OZ | 23.40 | 936.00 |
| 2,884 | PANTENE PRO V 80878 00452 CLASSIC CLEAN 13.5 OZ | 23.40 | 67,485.60 |
| | 1200CS Pry | | |
| | 980100109 7 | | |
| | FDA Product code 53EY-06 | | |
| 3,824 | Manufacturer Procter + Gamble | | |

Payment Detail pago
- ● Cash
- O Letter of Credit
- O Other

Name
Number
Expire

| | |
|---|---|
| SUBTOTAL | $89,481.60 |
| ABONO | |
| TOTAL | $89,481.60 |

*Import & Export*

*World Commerce*

ATM, inc (Curacao)
Willemstad, Curacao
Tel. 599-9-8339219 Fax 599-9-8339218

Invoice # 208C-CF-

# INVOICE

Client
Name APO HEALTH
Address
City
Phone

Date 22-Jan-04
order #

| Qty. Doz | Description | Doz. Price | Amount |
|---|---|---|---|
| 1,506 | PANTENE PRO V 80878 00463 13.5 OZ | 23.40 | 35,240.40 |
| 462 | HEAD & SHOULDER 37000 33804 REFRESH 13.5 OZ | 23.88 | 11,032.56 |
| 112 | PANTENE PRO V 80878 00462 CLASSIC CLEAN 13.5 OZ | 23.40 | 2,620.80 |
| 2,080 | | | |

#1

20 ft

DM# 29844/— PRE PAID

SUBTOTAL $48,893.76
ABONO
TOTAL $48,893.76

Payment Detail pago
- ● Cash
- O Letter of Credit
- O Other

Name
Number
Expire

*Import & Export*

*World Commerce*

Jan 26 04 03:20p JStahl APO Health 516 763 5631 p.1

Entry # F91 0021132 ; 8

ATM, inc (Curacao)
Willemstad, Curacao
Tel. 599-9-8339219 Fax 599-9-8339218

Invoice # 208A-CF

# INVOICE

Client
Name APO HEALTH
Address
City
Phone

Date 22-Jan-04
order #

| Qty. Doz | Description | Doz. Price | Amount |
|---|---|---|---|
| 1,700 | PANTENE PRO V 80878 00448 SMOOTH & SLEEK 13.5 OZ | 23.40 | 39,780.00 |
| 1,700 | PANTENE PRO V 80878 00449 COLOR REVIVAL 13.5 OZ | 23.40 | 39,780.00 |
| 760 | PANTENE PRO V 80878 00451 HYDRACURLS 13.5 OZ | 23.40 | 17,784.00 |
| 4,160 | 10,4 | | |
| | | SUBTOTAL | $97,344.00 |
| | | ABONO | |
| | | TOTAL | $97,344.00 |

Payment Detail page
- Cash
- Letter of Credit
- Other

Name
Number
Expire

$ 97344.00

Import & Export

World Commerce

APO-HD000193

ATM, inc (Curacao)
Willemstad, Curacao
Tel. 599-9-8339219 Fax 599-9-8339218

Invoice # 208D-CF-

# INVOICE

Client
Name APO HEALTH
Address
City
Phone

Date 4-Feb-04
order #

| Qty. Doz | Description | Doz. Price | Amount |
|---|---|---|---|
| 2,050 | HEAD & SHOULDER 37000 33799 CLASSIC CLEAN 13.5 OZ | 23.88 | 48,954.00 |
| 673 | HEAD & SHOULDER 37000 33804 REFRESH 13.5 OZ | 23.88 | 16,071.24 |
| 1,400 | HEAD & SHOULDER 37000 33805 DRY SCALP CARE 13.5 OZ | 23.88 | 33,432.00 |
| INNER BOXES 2,062 | | | |
| | CREDIT NOTE NO. 1 | | |
| | 2,062 INNER BOXES X 1.50 = $ 3,093.00 | | |
| | | SUBTOTAL | $98,457.24 |
| | | CREDIT NOTE | 3,093.00 |
| | | TOTAL | $95,364.24 |

Payment Detail pago
- (●) Cash
- ( ) Letter of Credit
- ( ) Other

Name
Number
Expire

*Import & Export*

*World Commerce*

APO-HD 00064

EXHIBIT

E

CONFIDENTIAL

MEMORANDUM to File May 28, 2004

**SUBJECT**: Potential Consumer Health Risk Associated With Hair Care Products Contaminated By *Pseudomonas aeruginosa.*

**SUMMARY:** There is a low overall health risk to consumers of developing an infection from the use of hair care products contaminated with a heavy concentration of *P aeruginosa*. Healthy individuals are unlikely to be at risk of *P. aeruginosa* infection. Although their population is small, immunocompomised individuals are at greatest risk of *P. aeruginosa* infection. In this population, the risk is significant and may include fatal infection in those with profound compromise.

**DISCUSSION:** *Pseudomonas aeruginosa* is commonly found in the environment and is best described as an opportunistic pathogen – a pathogen that is capable of producing disease in individuals whose normal host defense mechanisms are compromised in some fashion. A cosmetic product that is heavily contaminated with *P. aeruginosa* is very unlikely to be a health risk to those with competent immune systems. However, such a contaminated product would provide a risk of infection for those who are significantly immunocompromised, including individuals with immunodeficiency disorders, those undergoing cancer chemotherapy or organ rejection immunosuppressive therapy, individuals with chronic disease (e.g. diabetes, cystic fibrosis) and chronic infections (e.g., HIV), as well as those with damage which may compromise the integrity of physical barriers to infection, such as the skin and eye. Although some have estimated that such sensitive populations at risk could compose 20% of the US population (9), reports relevant to contaminated cosmetics are almost all from hospital exposures. These hospital exposures may be associated with a substantially greater level of immunocompromise in the individual and, therefore, a numerically smaller population. The risk to these individuals is significant and can include fatal infections in those with profound disease. There have been no reports of *P. aeruginosa* infection associated with cosmetics in a normal uncompromised consumer use setting and the risk seems consistent with the US Food and Drug Administration designation of *P aeruginosa* contaminated shampoo as warranting Class II recall (i.e., one which "may cause temporary or medically reversible adverse health consequences or where the probability of serious adverse health consequences is remote") [21 CFR 7.3(m)(2) and FDA's enforcement report record at: http://www.fda.gov/opacom/Enforce.html ].

**FINDINGS:** A review of the published literature, <u>in the context of infection from shampoo/conditioner heavily contaminated (=/>1x105-6 cfu/gram) with *P. aeruginosa*</u>, offered these observations:

<u>Healthy individuals are unlikely to be at risk of *P. aeruginosa* infection</u>. Continuous (for 7 days) dermal application of *P. aeruginosa* at high levels did not establish infections under normal conditions of exposure (1). Under conditions of "super hydration", damaging the stratum corneum, and scarification, breaching the horny layer, inflammation was established with *P. aeruginosa* at levels of 10E5 and greater.

Immunocompromised persons are at greatest risk for P. aeruginosa infection. Compromise of physical and biological barriers to infection can allow sustaining and even fatal infections due to P. aeruginosa. For example, Buttery et al. (2) reported clinical illness including *P. aeruginosa* bacteremia and infections of skin, catheter sites and urinary tract of immunocompromised neonates due to exposure to water-retaining toys. *Pseudomonas aeruginosa* contaminating the retained water was shown by molecular methods to be the source of infection. Similarly, *P. aeruginosa* from a nurse's infected thumb was found to cause infection in surgical patients (3). The same microorganism was recovered from a contaminated cosmetic in the nurse's home. Such exposure may be indirect, as Gram-negative bacteria including *P. aeruginosa* can be carried by medical personnel on items such as rings and artificial fingernails (4,5).
Cosmetics can be the source of *P. aeruginosa* infection after immunocompromise. Hopfer et al. (6) reported shampoo contaminated with *P. aeruginosa* to be the source of infection, one fatal, of individuals undergoing cancer chemotherapy. Ocular infections have been attributed to use of contaminated mascara, after physical trauma to the eye by the mascara brush (7).
Once established, P. aeruginosa infections are difficult to treat. Clinical isolates of *P. aeruginosa* are known to possess/develop antibiotic resistance (e.g. 8).

**References:**


1) Leyden et al. 1980. Experimental inoculations of *Pseudomonas aeruginosa* and *Pseudomonas cepacia* on human skin. J. Soc. Cosm. Chem. 31:19-28.
2) Buttery et al. 1998. Multiresistant *Pseudomonas aeruginosa* outbreak in a pediatric oncology ward related to bath toys. Pediatric. Infect. Dis. J. 17:509-513.
3) McNeil et al. 2001. Outbreak of sternal surgical site infections due to *Pseudomonas aeruginosa* traced to a scrub nurse with onychomycosis. Clin. Infect. Dis. 33:317-23
4) Trick et al. 2003. Impact of ring wearing on hand contamintion and comparison of hand hygiene agents in a hospital. Clin. Infect. Dis. 36:1383-1390.
5) Foca et al. 2000. Endemic *Pseudomonas aeruginosa* infection in a neonatal intensive care unit. N. Engl. J. Med. 343:695-700.
6) Hopfer et al. Hair clipping: another hazard for granulocytopenic patients? J. infect. Dis. 1158:655-656.
7) Wilson and Ahearn. 1977. Pseudomonas-induced corneal ulcers associated with contaminated eye mascaras. Am. J. Ophthamol. 84:112-119.
8) Valencia et al. 2004. Microbiologic evaluation of skin wounds: Alarming trend toward antibiotic resistance in an inpatient dermatology service during a 10-year period. J. Am. Acad. Dermatol. 50:845-9.
9) Rose et al. 1995. Linking microbiological criteria for foods with a quantitative risk assessment. J. Fd. Safety 15:121-132.



Phil Geis, Ph. D, Global BC PS&RA

Eric T. Evenson, MD, Global BC Medical

EXHIBIT

F

Int. Cl.: 3

Prior U.S. Cl.: 51

Reg. No. 1,484,935

# United States Patent and Trademark Office

Registered Apr. 19, 1988

## TRADEMARK
PRINCIPAL REGISTER

## PANTENE

RICHARDSON-VICKS INC. (DELAWARE CORPORATION)
TEN WESTPORT ROAD
WILTON, CT 06897

FOR: HAIR CONDITIONER, STYLING MOUSSE, HAIR STYLING GEL AND HAIR SPRAY, IN CLASS 3 (U.S. CL. 51).

FIRST USE 2-20-1952; IN COMMERCE 2-20-1952.

OWNER OF U.S. REG. NOS. 638,163, 1,074,055 AND OTHERS.

SER. NO. 677,513, FILED 8-10-1987.

HELEN ROBERTS WENDEL, EXAMINING ATTORNEY

Nº 1484935

# THE UNITED STATES OF AMERICA

## CERTIFICATE OF REGISTRATION

This is to certify that the records of the Patent and Trademark Office show that an application was filed in said Office for registration of the Mark shown herein, a copy of said Mark and pertinent data from the Application being annexed hereto and made a part hereof,

And there having been due compliance with the requirements of the law and with the regulations prescribed by the Commissioner of Patents and Trademarks,

Upon examination, it appeared that the applicant was entitled to have said Mark registered under the Trademark Act of 1946, and the said Mark has been duly registered this day in the Patent and Trademark Office on the

PRINCIPAL REGISTER

to the registrant named herein.

This registration shall remain in force for Twenty Years unless sooner terminated as provided by law.

In Testimony Whereof I have hereunto set my hand and caused the seal of the Patent and Trademark Office to be affixed this nineteenth day of April, 1988.

Commissioner of Patents and Trademarks

Int. Cl.: 3

Prior U.S. Cl.: 51

United States Patent and Trademark Office

10 Year Renewal

Reg. No. 638,163

Registered Dec. 4, 1956

Renewal Term Begins Dec. 4, 1996

TRADEMARK
PRINCIPAL REGISTER

# PANTÈNE

PROCTER & GAMBLE COMPANY, THE (OHIO CORPORATION)
ONE PROCTER & GAMBLE PLAZA
CINCINNATI, OH 45202, BY ASSIGNMENT, ASSIGNMENT, ASSIGNMENT, ASSIGNMENT, MERGER, ASSIGNMENT AND ASSIGNMENT FROM PANTEEN, A. G. (SWITZERLAND CORPORATION) BASEL, SWITZERLAND

PRIORITY CLAIMED UNDER SEC. 44(D) ON SWITZERLAND, FILED 2-17-1955, REG. NO. 154802, DATED 2-17-1955.

FOR: LOTIONS FOR THE CARE OF THE HAIR, IN CLASS 51 (INT. CL. 3).

FIRST USE 4-1-1945; IN COMMERCE 2-20-1952.

SER. NO. 71-688,660, FILED 6-1-1955.

*In testimony whereof I have hereunto set my hand and caused the seal of The Patent and Trademark Office to be affixed on Dec. 24, 1996.*

COMMISSIONER OF PATENTS AND TRADEMARKS

# The United States of America

## CERTIFICATE OF RENEWAL

This is to certify that the records of the Patent and Trademark Office show that an application was filed in said Office for renewal of registration of the Mark shown herein, a copy of said Mark and pertinent data from the Registration being annexed hereto and made a part hereof,

And there having been due compliance with the requirements of the law and with the regulations prescribed by the Commissioner of Patents and Trademarks,

Upon examination, it appeared that the applicant was entitled to have said Registration renewed under the Trademark Act of 1946, as amended, and said Registration has been duly renewed in the Patent and Trademark Office to the registrant named herein.

This Registration shall remain in force for TEN years from the date that said Registration was due to expire unless sooner terminated as provided by law.

In Testimony whereof I have hereunto set my hand and caused the seal of the Patent and Trademark Office to be affixed this twenty-fourth day of December 1996.

Bruce Lehman

Commissioner of Patents and Trademarks

Int. Cl.: 3

Prior U.S. Cls.: 1, 4, 6, 50, 51 and 52

United States Patent and Trademark Office

10 Year Renewal

Reg. No. 1,005,694
Registered Mar. 4, 1975
Renewal Term Begins Mar. 4, 1995

TRADEMARK
PRINCIPAL REGISTER

PANTENE

PROCTER & GAMBLE COMPANY, THE (OHIO CORPORATION)
ONE PROCTER & GAMBLE PLAZA
CINCINNATI, OH 45202, BY ASSIGNMENT AND ASSIGNMENT FROM HOFFMANN-LA ROCHE INC. (NEW JERSEY CORPORATION) NUTLEY, NJ

OWNER OF U.S. REG. NOS. 638,163 AND 719,760.

FOR: HAIR SHAMPOO [AND COLOGNE], IN CLASS 3 (U.S. CLS. 1, 4, 6, 50, 51 AND 52).

FIRST USE 12-11-1967; IN COMMERCE 12-11-1967.

SER. NO. 73-012,966, FILED 2-8-1974.

*In testimony whereof I have hereunto set my hand and caused the seal of The Patent and Trademark Office to be affixed on Sep. 12, 1995.*

COMMISSIONER OF PATENTS AND TRADEMARKS

# The United States of America

## CERTIFICATE OF RENEWAL

This is to certify that the records of the Patent and Trademark Office show that an application was filed in said Office for renewal of registration of the Mark shown herein, a copy of said Mark and pertinent data from the Registration being annexed hereto and made a part hereof,

And there having been due compliance with the requirements of the law and with the regulations prescribed by the Commissioner of Patents and Trademarks,

Upon examination, it appeared that the applicant was entitled to have said Registration renewed under the Trademark Act of 1946, as amended, and said Registration has been duly renewed in the Patent and Trademark Office to the registrant named herein.

This Registration shall remain in force for TEN years from the date that said Registration was due to expire unless sooner terminated as provided by law.

In Testimony whereof I have hereunto set my hand and caused the seal of the Patent and Trademark Office to be affixed this twelfth day of September 1995.

Int. Cl.: 3

Prior U.S. Cls.: 51 and 52

Reg. No. 1,491,844

United States Patent and Trademark Office Registered June 14, 1988

## TRADEMARK
## PRINCIPAL REGISTER



RICHARDSON-VICKS INC. (DELAWARE CORPORATION)
TEN WESTPORT ROAD
WILTON, CT 06897

FOR: HAIR SHAMPOO, HAIR CONDITIONER, HAIR SPRAY, HAIR STYLING GEL AND MOUSSE, IN CLASS 3 (U.S. CLS. 51 AND 52).
FIRST USE 1-0-1986; IN COMMERCE 1-0-1986.

OWNER OF U.S. REG. NO. 1,005,694.

THE MARK CONSISTS OF THE STYLIZED DESIGN OF A CURL OF HAIR.

SER. NO. 680,538, FILED 8-24-1987.

MICHAEL HAMILTON, EXAMINING ATTORNEY

No. 1491844

# THE UNITED STATES OF AMERICA

## CERTIFICATE OF REGISTRATION

This is to certify that the records of the Patent and Trademark Office show that an application was filed in said Office for registration of the Mark shown herein, a copy of said Mark and pertinent data from the Application being annexed hereto and made a part hereof,

And there having been due compliance with the requirements of the law and with the regulations prescribed by the Commissioner of Patents and Trademarks,

Upon examination, it appeared that the applicant was entitled to have said Mark registered under the Trademark Act of 1946, and the said Mark has been duly registered this day in the Patent and Trademark Office on the

PRINCIPAL REGISTER

to the registrant named herein.

This registration shall remain in force for Twenty Years unless sooner terminated as provided by law.

In Testimony Whereof I have hereunto set my hand and caused the seal of the Patent and Trademark Office to be affixed this fourteenth day of June, 1988.

Commissioner of Patents and Trademarks

Int. Cl.: 3

Prior U.S. Cls.: 1, 4, 6, 50, 51, and 52

Reg. No. 2,207,500

United States Patent and Trademark Office

Registered Dec. 1, 1998

## TRADEMARK
PRINCIPAL REGISTER



PROCTER & GAMBLE COMPANY, THE (OHIO CORPORATION)
ONE PROCTER & GAMBLE PLAZA
CINCINNATI, OH 45202

FOR: SHAMPOO AND CONDITIONER FOR THE HAIR; HAIR STYLING PRODUCTS, NAMELY, MOUSSE, GEL, SPRAY-ON GEL, SPRITZ, AEROSOL AND NON-AEROSOL HAIR SPRAYS, IN CLASS 3 (U.S. CLS. 1, 4, 6, 50, 51 AND 52).

FIRST USE 8-17-1998; IN COMMERCE 8-17-1998.

OWNER OF U.S. REG. NOS. 638,163, 1,805,042, AND OTHERS.

THE DESIGN CONSISTS OF A STYLIZED HAIR CURL. NO CLAIM IS MADE TO THE USE OF COLOR.

SN 75-174,009, FILED 9-30-1996.

DEBORAH LOBO, EXAMINING ATTORNEY

# The United States of America

## CERTIFICATE OF REGISTRATION
### PRINCIPAL REGISTER

*The Mark shown in this certificate has been registered in the United States Patent and Trademark Office to the named registrant.*

*The records of the United States Patent and Trademark Office show that an application for registration of the Mark shown in this Certificate was filed in the Office, that the application was examined and determined to be in compliance with the requirements of the law and with the regulations prescribed by the Commissioner of Patents and Trademarks, and that the Applicant is entitled to registration of the Mark under the Trademark Act of 1946, as Amended.*

*A copy of the Mark and pertinent data from the application are a part of this certificate.*

*This registration shall remain in force for TEN (10) years, unless terminated earlier as provided by law, and subject to compliance with the provisions of Section 8 of the Trademark Act of 1946, as Amended.*

Bruce Lehman

Commissioner of Patents and Trademarks

# The United States of America



## CERTIFICATE OF REGISTRATION

### PRINCIPAL REGISTER

*The Mark shown in this certificate has been registered in the United States Patent and Trademark Office to the named registrant.*

*The records of the United States Patent and Trademark Office show that an application for registration of the Mark shown in this Certificate was filed in the Office; that the application was examined and determined to be in compliance with the requirements of the law and with the regulations prescribed by the Director of the United States Patent and Trademark Office; and that the Applicant is entitled to registration of the Mark under the Trademark Act of 1946, as Amended.*

*A copy of the Mark and pertinent data from the application are part of this certificate.*

*This registration shall remain in force for TEN (10) years, unless terminated earlier as provided by law, and subject to compliance with the provisions of Section 8 of the Trademark Act of 1946, as Amended.*



*Director of the United States Patent and Trademark Office*

**Int. Cl.: 11**

**Prior U.S. Cls.: 13, 21, 23, 31, and 34**

**Reg. No. 2,757,654**

**United States Patent and Trademark Office** **Registered Aug. 26, 2003**

## TRADEMARK
### PRINCIPAL REGISTER

THE PROCTER & GAMBLE COMPANY (OHIO CORPORATION)
ONE PROCTER & GAMBLE PLAZA
CINCINNATI, OH 45202

FOR: HAND-HELD ELECTRIC HAIR DRYERS, IN CLASS 11 (U.S. CLS. 13, 21, 23, 31 AND 34).

FIRST USE 9-30-2002; IN COMMERCE 9-30-2002.

OWNER OF U.S. REG. NOS. 1,005,694, 2,447,037, AND OTHERS.

THE MARK CONSISTS OF STYLIZED LETTERS IN THE WORD.

SN 78-137,573, FILED 6-21-2002.

RAUL CORDOVA, EXAMINING ATTORNEY

# The United States of America



## CERTIFICATE OF REGISTRATION

### PRINCIPAL REGISTER

*The Mark shown in this certificate has been registered in the United States Patent and Trademark Office to the named registrant.*

*The records of the United States Patent and Trademark Office show that an application for registration of the Mark shown in this Certificate was filed in the Office; that the application was examined and determined to be in compliance with the requirements of the law and with the regulations prescribed by the Director of the United States Patent and Trademark Office; and that the Applicant is entitled to registration of the Mark under the Trademark Act of 1946, as Amended.*

*A copy of the Mark and pertinent data from the application are part of this certificate.*

*This registration shall remain in force for TEN (10) years, unless terminated earlier as provided by law, and subject to compliance with the provisions of Section 8 of the Trademark Act of 1946, as Amended.*




*Director of the United States Patent and Trademark Office*

Int. Cl.: 3

Prior U.S. Cls.: 1, 4, 6, 50, 51, and 52

Reg. No. 2,447,036

**United States Patent and Trademark Office** Registered Apr. 24, 2001

## TRADEMARK
## PRINCIPAL REGISTER

PANTENE
PRO-V

PROCTER & GAMBLE COMPANY, THE (OHIO CORPORATION)
ONE PROCTER & GAMBLE PLAZA
CINCINNATI, OH 45202

FOR: HAIR CARE PREPARATIONS, IN CLASS 3 (U.S. CLS. 1, 4, 6, 50, 51 AND 52).

FIRST USE 1-14-2000; IN COMMERCE 1-14-2000.

OWNER OF U.S. REG. NOS. 638,163, 1,822,234, AND OTHERS.

THE STIPPLING IS NOT A FEATURE OF THE MARK, NOR WAS IT INTENDED TO INDICATE COLOR.

THE MARK IS DESCRIBED AS STYLIZED LETTERS IN THE WORD "PRO-V" EXISTING WITH THE NON-STYLIZED WORDS "PANTENE PRO-V".

SN 75-757,269, FILED 7-21-1999.

C. DIONNE CLYBURN, EXAMINING ATTORNEY

Int. Cl.: 3

Prior U.S. Cl.: 51

Reg. No. 1,822,234
Registered Feb. 22, 1994

# United States Patent and Trademark Office

## TRADEMARK
PRINCIPAL REGISTER

## PRO-V

RICHARDSON-VICKS INC. (DELAWARE CORPORATION)
ONE PROCTER & GAMBLE PLAZA
CINCINNATI, OH 45202

FOR: HAIR STYLING PRODUCTS; NAMELY, MOUSSE, GEL, SPRAY-ON GEL, SPRITZ, AEROSOL AND NON-AEROSOL HAIR SPRAYS, IN CLASS 3 (U.S. CL. 51).

FIRST USE 9-1-1992; IN COMMERCE 9-1-1992.

OWNER OF U.S. REG. NO. 1,719,290.

SER. NO. 74-401,851, FILED 6-11-1993.

CHRISTOPHER KELLY, EXAMINING ATTORNEY

# The United States of America

№ 1822234

## CERTIFICATE OF REGISTRATION

This is to certify that the records of the Patent and Trademark Office show that an application was filed in said Office for registration of the Mark shown herein, a copy of said Mark and pertinent data from the Application being annexed hereto and made a part hereof,

And there having been due compliance with the requirements of the law and with the regulations prescribed by the Commissioner of Patents and Trademarks,

Upon examination, it appeared that the applicant was entitled to have said Mark registered under the Trademark Act of 1946, as amended, and the said Mark has been duly registered this day in the Patent and Trademark Office on the

PRINCIPAL REGISTER

to the registrant named herein.

This registration shall remain in force for TEN years unless sooner terminated as provided by law.

In Testimony Whereof I have hereunto set my hand and caused the seal of the Patent and Trademark Office to be affixed this twenty-second day of February 1994.

Bruce Lehman

Int. Cl.: 3

Prior U.S. Cls.: 51 and 52

Reg. No. 1,719,290

# United States Patent and Trademark Office

Registered Sep. 22, 1992

## TRADEMARK
## PRINCIPAL REGISTER

## PRO-V

RICHARDSON-VICKS INC. (DELAWARE CORPORATION)
ONE PROCTER & GAMBLE PLAZA
CINCINNATI, OH 45202

FOR: SHAMPOO AND CONDITIONER FOR THE HAIR, IN CLASS 3 (U.S. CLS. 51 AND 52).

FIRST USE 2-18-1992; IN COMMERCE 2-18-1992.

SN 74-181,904, FILED 6-28-1991.

NANCY L. HANKIN, EXAMINING ATTORNEY

1051913

# THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

August 12, 2003

THE ATTACHED U.S. TRADEMARK REGISTRATION *1,719,290* IS CERTIFIED TO BE A TRUE COPY WHICH IS IN FULL FORCE AND EFFECT WITH NOTATIONS OF ALL STATUTORY ACTIONS TAKEN THEREON AS DISCLOSED BY THE RECORDS OF THE UNITED STATES PATENT AND TRADEMARK OFFICE.

REGISTERED FOR A TERM OF *10* YEARS FROM *September 22, 1992*
*1st* RENEWAL FOR A TERM OF *10* YEARS FROM *September 22, 2002*
SECTION 8 & 15
SAID RECORDS SHOW TITLE TO BE IN:
*PROCTER & GAMBLE COMPANY, THE*
*AN OHIO CORPORATION*

By Authority of the
COMMISSIONER OF PATENTS AND TRADEMARKS

L. Edelen

L. EDELEN
Certifying Officer

Int. Cl.: 3

Prior U.S. Cls.: 1, 4, 6, 50, 51, and 52

Reg. No. 2,447,037

United States Patent and Trademark Office Registered Apr. 24, 2001

## TRADEMARK
## PRINCIPAL REGISTER



PROCTER & GAMBLE COMPANY, THE (OHIO CORPORATION)
ONE PROCTER & GAMBLE PLAZA
CINCINNATI, OH 45202

FOR: HAIR CARE PREPARATIONS, IN CLASS 3 (U.S. CLS. 1, 4, 6, 50, 51 AND 52).

FIRST USE 1-14-2000; IN COMMERCE 1-14-2000.

THE STIPPLING IS NOT A FEATURE OF THE MARK, NOR WAS IT INTENDED TO INDICATE COLOR.

THE MARK IS DESCRIBED AS STYLIZED LETTERS IN THE WORD "PRO-V".

SN 75-757,270, FILED 7-21-1999.

C. DIONNE CLYBURN, EXAMINING ATTORNEY

# The United States of America

## CERTIFICATE OF REGISTRATION

### PRINCIPAL REGISTER

*The Mark shown in this certificate has been registered in the United States Patent and Trademark Office to the named registrant.*

*The records of the United States Patent and Trademark Office show that an application for registration of the Mark shown in this Certificate was filed in the Office; that the application was examined and determined to be in compliance with the requirements of the law and with the regulations prescribed by the Director of the United States Patent and Trademark Office; and that the Applicant is entitled to registration of the Mark under the Trademark Act of 1946, as Amended.*

*A copy of the Mark and pertinent data from the application are part of this certificate.*

*This registration shall remain in force for TEN (10) years, unless terminated earlier as provided by law, and subject to compliance with the provisions of Section 8 of the Trademark Act of 1946, as Amended.*

Nicholas P. Godici

*Director of the United States Patent and Trademark Office*

**Int. Cl.: 11**

**Prior U.S. Cls.: 13, 21, 23, 31, and 34**

**Reg. No. 2,796,187**

**Registered Dec. 16, 2003**

# United States Patent and Trademark Office

## TRADEMARK
## PRINCIPAL REGISTER

PRO-V

THE PROCTER & GAMBLE COMPANY (OHIO CORPORATION)
ONE PROCTER & GAMBLE PLAZA
CINCINNATI, OH 45202

FOR: HAND-HELD ELECTRIC HAIR DRYERS, IN CLASS 11 (U.S. CLS. 13, 21, 23, 31 AND 34).

FIRST USE 9-30-2002; IN COMMERCE 9-30-2002.

OWNER OF U.S. REG. NOS. 2,447,036 AND 2,447,037.

THE MARK CONSISTS OF STYLIZED LETTERS IN THE WORD "PRO-V" EXISTING WITH THE NON-STYLIZED WORD "PRO-V".

SN 78-141,902, FILED 7-8-2002.

YSA DEJESUS, EXAMINING ATTORNEY

# The United States of America

## CERTIFICATE OF REGISTRATION

### PRINCIPAL REGISTER

*The Mark shown in this certificate has been registered in the United States Patent and Trademark Office to the named registrant.*

*The records of the United States Patent and Trademark Office show that an application for registration of the Mark shown in this Certificate was filed in the Office; that the application was examined and determined to be in compliance with the requirements of the law and with the regulations prescribed by the Director of the United States Patent and Trademark Office; and that the Applicant is entitled to registration of the Mark under the Trademark Act of 1946, as Amended.*

*A copy of the Mark and pertinent data from the application are part of this certificate.*

*This registration shall remain in force for TEN (10) years, unless terminated earlier as provided by law, and subject to compliance with the provisions of Section 8 of the Trademark Act of 1946, as Amended.*

*Director of the United States Patent and Trademark Office*

EXHIBIT

6

# [U]nited States Patent Office

729,556
Registered Apr. 3, 1962

## PRINCIPAL REGISTER
## Trademark

Ser. No. 115,164, filed Mar. 8, 1961

## HEAD & SHOULDERS

The Procter & Gamble Company (Ohio corporation)
301 E. 6th St.
Cincinnati 2, Ohio

For: HAIR SHAMPOO, in CLASS 52.
First use Jan. 3, 1961; in commerce Jan. 3, 1961.

Nº 729556

# THE UNITED STATES OF AMERICA

This is to certify that from the records of the Patent Office it appears that an application was filed in said Office for registration of the Mark shown herein, a copy of said Mark and pertinent data from the Application being annexed hereto and made a part hereof,

And there having been due compliance with the requirements of the law and with the regulations prescribed by the Commissioner of Patents,

Upon examination, it appeared that the applicant was entitled to have said Mark registered under the Trademark Act of 1946, and the said Mark has been duly registered this day in the Patent Office on the

PRINCIPAL REGISTER

to the registrant named herein.

This registration shall remain in force for Twenty Years unless sooner terminated as provided by law.

In Testimony Whereof I have hereunto set my hand and caused the seal of the Patent Office to be affixed this third day of April, 1962.

COMMISSIONER OF PATENTS

ATTEST:

ATTESTING OFFICER

# The United States of America

## CERTIFICATE OF RENEWAL

Reg. No. 729556

Application to renew the above identified registration having been duly filed in the Patent and Trademark Office and there having been compliance with the requirements of the law and with the regulations prescribed by the Commissioner of Patents and Trademarks,

This is to certify that said registration has been renewed in accordance with the Trademark Act of 1946 to The Procter & Gamble Company , of Cincinnati, Ohio

Ohio Corporation
and said registration will remain in force for twenty years from April 3, 1982
unless sooner terminated as provided by law.

In Testimony Whereof I have hereunto set my hand and caused the seal of the Patent and Trademark Office to be affixed this eleventh day of May, 1982.

COMMISSIONER OF PATENTS AND TRADEMARKS

Int. Cl.: 5

Prior U.S. Cls.: 18 and 52

Reg. No. 1,653,440

United States Patent and Trademark Office Registered Aug. 13, 1991

TRADEMARK
PRINCIPAL REGISTER

HEAD & SHOULDERS INTENSIVE TREATMENT

PROCTER & GAMBLE COMPANY (OHIO CORPORATION)
ONE PROCTER & GAMBLE PLAZA
CINCINNATI, OH 45202

FOR: DANDRUFF SHAMPOO, IN CLASS 5 (U.S. CLS. 18 AND 52).

FIRST USE 7-2-1990; IN COMMERCE 7-2-1990.

OWNER OF U.S. REG. NOS. 729,556 AND 1,434,446.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "INTENSIVE TREATMENT", APART FROM THE MARK AS SHOWN.

SER. NO. 74-090,381, FILED 8-22-1990.

JOHN MICHOS, EXAMINING ATTORNEY

# The United States of America

Nº 1653440

## CERTIFICATE OF REGISTRATION

This is to certify that the records of the Patent and Trademark Office show that an application was filed in said Office for registration of the Mark shown herein, a copy of said Mark and pertinent data from the Application being annexed hereto and made a part hereof,

And there having been due compliance with the requirements of the law and with the regulations prescribed by the Commissioner of Patents and Trademarks,

Upon examination, it appeared that the applicant was entitled to have said Mark registered under the Trademark Act of 1946, as amended, and the said Mark has been duly registered this day in the Patent and Trademark Office on the

PRINCIPAL REGISTER

to the registrant named herein.

This registration shall remain in force for TEN years unless sooner terminated as provided by law.

In Testimony Whereof I have hereunto set my hand and caused the seal of the Patent and Trademark Office to be affixed this thirteenth day of August 1991.

Harry F. Manbeck, Jr.

Int. Cl.: 3

Prior U.S. Cls.: 1, 4, 6, 50, 51, and 52

Reg. No. 2,791,735

United States Patent and Trademark Office

Registered Dec. 9, 2003

TRADEMARK
PRINCIPAL REGISTER

THE PROCTER & GAMBLE COMPANY (OHIO CORPORATION)
ONE PROCTER & GAMBLE PLAZA
CINCINNATI, OH 45202

FOR: HAIR CARE PREPARATIONS, IN CLASS 3 (U.S. CLS. 1, 4, 6, 50, 51 AND 52).

FIRST USE 8-9-2001; IN COMMERCE 8-9-2001.

THE MARK CONSISTS OF TWO OVERLAPPING OVALS WHICH SURROUND THE LETTERS H&S AND COME TOGETHER AT A WAVY 3 FLAG DESIGN.

SN 75-950,389, FILED 2-29-2000.

TARAH HARDY, EXAMINING ATTORNEY

# The United States of America

## CERTIFICATE OF REGISTRATION

### PRINCIPAL REGISTER

*The Mark shown in this certificate has been registered in the United States Patent and Trademark Office to the named registrant.*

*The records of the United States Patent and Trademark Office show that an application for registration of the Mark shown in this Certificate was filed in the Office; that the application was examined and determined to be in compliance with the requirements of the law and with the regulations prescribed by the Director of the United States Patent and Trademark Office; and that the Applicant is entitled to registration of the Mark under the Trademark Act of 1946, as Amended.*

*A copy of the Mark and pertinent data from the application are part of this certificate.*

*This registration shall remain in force for TEN (10) years, unless terminated earlier as provided by law, and subject to compliance with the provisions of Section 8 of the Trademark Act of 1946, as Amended.*

UNITED STATES PATENT AND TRADEMARK OFFICE · DEPARTMENT OF COMMERCE

*Director of the United States Patent and Trademark Office*

EXHIBIT

H

Washington Mutual Bank, FA

SYLVIE H GRUENBERG
GARY GRUENBERG
1000 W ISLAND BLVD APT 1009
AVENTURA FL 33160-5615

## Incoming Wire Transfer Notice

Dear Valued Customer:
We are writing today to let you know that the following transaction(s) have posted to your account. If you have questions, please call us at 1-800-788-7000. We're here 24 hours a day, seven days a week, and our goal is to provide you with the best customer service possible. Thanks for banking with Washington Mutual.

| | |
|---|---|
| **Transaction Date:** | 11/18/2003 |
| **Account:** | 489-234463-4 |
| **Washington Mutual Processing Site:** | Stockton |
| **Wire Transfer Deposit :** | 97,414.20 |
| **Wire Transfer Fee:** | 10.00 - |
| **FEDplus/PAYplus Reference:** | 031118121230F100 |
| **Fed Reference:** | 20031118L1LFAS1C002255111181511FT01 |
| **Beneficiary:** | GARY GRUENBERG |
| **Other Beneficiary Information:** | |
| **Sender Name:** | JPMORGAN CHASE BANK |
| **Sender ABA:** | 021000021 |
| **Sender Reference:** | 0216600322EU |
| **By Order of/Originating Party:** | APO HEALTH |

**ATM, inc**
**Willemstad, Curacao**
**Tel. 599-9-8339219 Fax 599-9-8339218**

Invoice # **213**

# INVOICE

Client
Name **APO Health**
Address 3590 Oceanside Road
City Oceanside, NY 11572
Phone Att. Dr. Jan Stahl

Date 30-Oct-03
order #

| Doz. | Description | Price | Amount |
|---|---|---|---|
| 1,614 | Pantene Shampoo 8087800448 | 23.40 | 37,767.60 |
| 1,653 | Pantene Shampoo 8087800449 | 23.40 | 38,680.20 |
| 896 | Pantene Shampoo 8087800450 | 23.40 | 20,966.40 |

SUBTOTAL $97,414.20

TOTAL $97,414.20

Payment Detail pago
- (●) Cash
- ( ) Credit
- ( ) Other

Name
Number
Expire

*Import & Export*

*World Commerce*

APO-HD 00087

EXHIBIT I

**Alan Cohen**

**From:** Fragrance Zone [fragrancezone@earthlink.net]
**Sent:** Wednesday, November 19, 2003 9:59 AM
**To:** Alan Cohen
**Subject:** shampoos

DEPOSITION EXHIBIT

Hi Alan,

Here attached is the corrected proformas for the batteries and shampoos we discussed.

We can get the shampoos out within 30 days if you deposit right away. Any delay in the deposit will cause a delay in the delivery based on scheduling.

Also, we can get the battery order out within 20 again with no delay in deposit.

Let me know what you plan to do.

Thanks!!

**ATM, inc**
Willemstad, Curacao
Tel. 599-9-8339219 Fax 599-9-8339218

Pro Forma **PROF335**

# PROFORMA

Client
Name: Global Marketing
Address: 1 Turnberry Place, Suite 609
City: Aventura, Florida
Phone:

Date: NOV 20 2003
order #:

| Qty. Doz | Description | Doz. Price | Amount |
|---|---|---|---|
| 2,660 | MASTER CASE DURACELL AA<br>56 BLISTER OF 4 PER CASE | 58.80 | 156,408.00 |
| 742 | MASTER CASE DURACELL AAA<br>54 BLISTER OF 4 PER CASE | 56.70 | 42,071.40 |
| | PAYMENT TERMS<br>20% DEPOSIT | | |
| 3,402 | PARTIAL SHIPMENT PERMITED<br>TO BE PA' ID AGAINST THE PRESENTATION<br>OF THE FOLLOWING DOCUMENTS<br>1- Original Invoice + 2 copies<br>2.- ORIGINAL CERTIFICATE OF INSPECTION IN WILLEMSTAD, CURACAO SIGNED BY A REPRESENTATIVE OF GLOBAL MARKETING WITHIN 3 DAYS OF PRESENTING ORIGINAL INVOICE. | | |

| | |
|---|---|
| SUBTOTAL | $198,479.40 |
| deposit | 39,695.88 |
| TOTAL | $158,783.52 |

Payment Detail pago
- ● Cash
- ○ Letter of Credit
- ○ Other

Name ______
Number ______
Expire ______

*Import & Export*

*World Commerce*

**ATM, inc**
**Willemstad, Curacao**
**Tel. 599-9-8339219 Fax 599-9-8339218**

Pro Forma **PROF019**

# PROFORMA

**Client**
Name **Global Marketing**
Address 1 Turnberry Place, Suite 609
City Aventura, Florida 3318
Phone

Date November 20, 2003
order #

| Qty. Doz | Description | Doz. Price | Amount |
|---|---|---|---|
| 1,200 | PANTENE PRO V 80878 00448 SMOOTH & SLEEK 13.5 OZ | 24.00 | 28,800.00 |
| 900 | PANTENE PRO V 80878 00449 COLOR REVIVAL 13.5 OZ | 24.00 | 21,600.00 |
| 900 | PANTENE PRO V 80878 00450 SHEER VOLUME 13.5 OZ | 24.00 | 21,600.00 |
| 600 | PANTENE PRO V 80878 00451 HYDRACURLS 13.5 OZ | 24.00 | 14,400.00 |
| 1,200 | PANTENE PRO V 80878 00452 CLASSIC CLEAN 13.5 OZ | 24.00 | 28,800.00 |
| 1,200 | PANTENE PRO V 80878 00453 CLARYFYING SHAMPOO 13.5 OZ | 24.00 | 28,800.00 |
| 1,200 | HEAD & SHOULDER 37000 33799 CLASSIC CLEAN 13.5 OZ | 24.48 | 29,376.00 |
| 1,200 | HEAD & SHOULDER 37000 33802 SMOOTH & SILKY 13.5 OZ | 24.48 | 29,376.00 |
| 1,200 | HEAD & SHOULDER 37000 33803 EXTRA FULLNESS 13.5 OZ | 24.48 | 29,376.00 |
| 1,200 | HEAD & SHOULDER 37000 33804 REFRESH 13.5 OZ | 24.48 | 29,376.00 |
| 1,800 | HEAD & SHOULDER 37000 33805 DRY SCALP CARE 13.5 OZ | 24.48 | 44,064.00 |
| | CIF CURACAO<br>BALANCE DUE UPON FINAL INVOICE<br>WHEN MERCHANDISE ARRIVES IN CURACAO | | |
| 12,600 | | | |

| | |
|---|---|
| SUBTOTAL | $305,568.00 |
| Less: 20% Deposit | 61,113.60 |
| TOTAL | $244,454.40 |

**Payment Detail pago**
- ● Cash
- ○ Letter of Credit
- ○ Other

Name
Number
Expire

*Import & Export*

*World Commerce*

Washington Mutual Bank, FA

DEPOSITION EXHIBIT

SYLVIE H GRUENBERG
GARY GRUENBERG
1000 W ISLAND BLVD APT 1009
AVENTURA FL 33160-5615

## Incoming Wire Transfer Notice

Dear Valued Customer:
We are writing today to let you know that the following transaction(s) have posted to your account. If you have questions, please call us at 1-800-788-7000. We're here 24 hours a day, seven days a week, and our goal is to provide you with the best customer service possible. Thanks for banking with Washington Mutual.

| | |
|---|---|
| **Transaction Date:** | 12/03/2003 |
| **Account:** | 489-234463-4 |
| **Washington Mutual Processing Site:** | Stockton |
| **Wire Transfer Deposit :** | 61,113.60 |
| **Wire Transfer Fee:** | 10.00- |
| **FEDplus/PAYplus Reference:** | 031203070019F100 |
| **Fed Reference:** | 20031203L1LFAS1C00086612030959FT01 |
| **Beneficiary:** | GARY GRUENBERG |
| **Other Beneficiary Information:** | REF:SHAMPOO DEPOSIT |
| **Sender Name:** | BANK OF AMERICA N.A. |
| **Sender ABA:** | 026009593 |
| **Sender Reference:** | 2003120300005747 |
| **By Order of/Originating Party:** | THE GLOBAL MARKETING CENTER, INC. |

HE FOLLOWING WIRE HAS DEBITED TODAY:

RANSACTION REF: 20031203000005747

USD AMOUNT $61,113.60

ENEFICIARY: GARY GRUENBERG
ENEFICIARY'S BANK: WASHINGTON MUTUAL BANK, F.A.
IT DETAIL: REF:SHAMPOO DEPOSIT

SERVICE REF: 20031203000005747/000121
IMAD: 20031203B6B7HU7R000121
ID: 4892344634
ID: 267084131

DEPOSITION EXHIBIT
Cohen # 29
1/13/05