UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
THE PROCTOR & GAMBLE COMPANY,

                         Plaintiff,              **MEMORANDUM & ORDER**
           - against -                          04 Civ. 2820 (DRH) (WDW)

XETAL, INC., et al

                        Defendants.
----------------------------------X

**APPEARANCES :**

**For the Plaintiff:**
**Fulbright & Jaworski L.L.P.**
666 Fifth Avenue
New York, NY 10103
By:    Mark N. Mutterperl, Esq.

**Kramer Levin Naftalis & Frankel L.L.P.**
1177 Avenue of the Americas
New York, New York 10036
By:    Geoffrey Potter, Esq.
        Yehudis Lewis, Esq.

**For Defendant Gary Gruenberg**
**Gary Gruenberg**
Defendant Pro Se
1000 W. Island Blvd
Suite 1009
Miami, Florida 33160


**HURLEY, Senior District Judge**:

      Plaintiff The Proctor & Gamble Company ("Plaintiff" or "P&G") brought the present action against, inter alia, defendant Gary Gruenberg ("Gruenberg") alleging various causes of action, including trademark infringement and false designation of origin, *see* 15 U.S.C. §§ 1114,

1125, as well as common law unfair competition.[1] According to the complaint, Gruenberg and the other defendants sold and distributed counterfeit Head & Shoulders and Pantene shampoos. Presently before the Court is Plaintiff's second motion for summary judgment against Gruenberg.[2] For the reasons set forth below, the motion is denied.

*Background*

On this motion, it is Plaintiff's position that Gruenberg sold shampoo labeled Pantene and Head & Shoulders to defendant APO Health Inc. ("APO"), who in turn sold the products to Defendants Quality King, Inc. ("Quality King") and Victory Wholesale Grocers ("Victory"); Victory then sold the products to Rite-Aid. The shampoo Quality King purchased from APO was counterfeit, as was the shampoo Rit-Aid purchased from Victory.

The following facts are derived from the evidentiary submissions and are undisputed, unless otherwise noted. When appropriate, the Court has noted where there is a lack of

---

[1] The Second Amended Complaint asserts the following nine causes of action: (1) Federal Trademark Infringement, 15 U.S.C. § 1114(1)(a); (2) Federal Trademark Infringement 15 U.S.C. § 1114(1)(b); (3) Federal False Description and False Designation of Origin, 15 U.S.C. §1125(a)(1)(A); (4) Federal False Advertising, 15 U.S.C. § 1125(a)(1)(B); (5) Federal Dilution of Mark, 15 U.S.C. § 1125(c); (6) New York Dilution of Mark and Injury to Business Reputation; (7) New York Deceptive Business Practices, N.Y. Gen'l Bus. Law § 349; (8) Common Law Unfair Competition; and (9) Common Law Unjust Enrichment. Although Plaintiff's notice of motion seeks "summary judgment," the Memorandum of Law refers only to the claims for federal trademark infringement, federal false description and false designation of origin, and New York common law unfair competition. Thus, the Court will address only these claims in ruling on the instant motion.

[2] The first motion for summary judgment against Gruenberg was denied without prejudice for failure to serve Gruenberg with a "Notice To Pro Se Litigant Opposing Motion For Summary Judgment" as required by Local Rule 56.2. Plaintiff has served said notice in connection with the instant motion.

evidentiary support for relevant facts.

Plaintiff is the owner of various federal trademark registrations for the name "Pantene," and for certain aspects of the "Pantene" trade dress. Plaintiff is also the owner of various federal trademark registrations for "Pro-V" and "Head and Shoulders," as well as for certain aspects of "Pro-V" trade dress and "Head and Shoulders" trade dress.

In October 2004, Plaintiff obtained an order from a Panamanian court authorizing it to search the offices and computer of co-defendant Fred Harrick ("Harrick") for evidence concerning Harrick's counterfeiting activities. Computer experts copied the hard drives of Harrick's computers, then analyzed and forensically restored and retrieved data from the hard drives. Included in the retrieved and restored data are e-mails between Harrick and another co-defendant Paul Chou ("Chou"). These e-mails, all dated August, September and October of 2003, would appear to indicate that Harrick and Chou were engaged in manufacturing and selling counterfeit Pantene and Head & Shoulders shampoos, as well as other products. Four of these e-mails referring to shampoo, "H&S" or "Pant," were forwarded to Gruenberg. There is no evidence that Gruenberg received or replied to these e-mails.[3] In his affidavit, Gruenberg denies receiving the e-mails and claims that Harrick runs a legitimate import/export company that sells private labels as well as name brand products obtained through (1) legitimate factories licensed by, for example, Plaintiff to manufacture and sell its products, (2) authorized agents and (3) the

---

[3] Plaintiff also submits e-mails between Chou and Harrick apparently evidencing their "conspiracy" to manufacture and sell counterfeit Reynolds aluminum foil, Duracell batteries and Gillette razors. As to these items, Plaintiff also submits e-mails to and from Gruenberg which appear to evidence his participation in these activities as well. There are, however, no claims relating to Reynolds aluminum foil, Duracell batteries or Gillette razors in this action.

gray market.[4]  Gruenberg denies having ever met, talked to, or seen Chou and denies conspiring to manufacture counterfeit Proctor & Gamble products.  According to Gruenberg, Harrick told him that ATM buys direct from the manufacturer and authorized distributors who distribute the products to the Caribbean Islands and that each market has different packaging requirements.  He asserts that he did not directly sell any products, including Plaintiff's shampoos.  Rather, he introduced customers to Harrick who, in turn, offered the goods for sale.

Defendant Jan Stahl ("Stahl"), an employee of APO, testified at his deposition that in or around July 2003, Gruenberg, through a company called ATM, offered to sell to APO certain Pantene and Head & Shoulders shampoos.  APO, in turn, offered these items to Quality King and Victory.  Quality King placed an order with APO, who then placed an order with ATM.[5]  APO did not purchase products labeled Pantene or Head and Shoulders from anyone other than ATM.  Stahl assumed that ATM was Gruenberg's company.  Gruenberg denies that ATM is his company.  No information is provided as to whether Quality King purchased shampoo products labeled Pantene or Head & Shoulders from anyone other than APO.

Alan Cohen ("Cohen"), an employee of Global Marketing, gave the following undisputed

---

[4] Gray market goods are generally defined as "genuine goods that . . . are of foreign manufacture, bearing a legally affixed foreign trademark that is the same mark as is registered in the United States; gray goods are legally acquired abroad and then imported without the consent of the United States trademark holder." *Gamut Trading Co. v. U.S. Int'l Trade Comm'n*, 200 F.3d 775, 778 (Fed. Cir. 1999).  "The principle of gray market law is that the importation of a product that was produced by the owner of the United States trademark or with its consent, but not authorized for sale in the United States, may, in appropriate cases, infringe the United States trademark." *Id.* at 777.

[5] The submitted portions of Stahl's deposition transcript do not contain testimony that APO in fact sold any of the products at issue to Victory.  The evidence before this Court is that Stahl offered the products to Victory.

testimony at his deposition. In the latter part of 2003,[6] Cohen purchased Pantene and Head & Shoulders from Gruenberg for a client "Grapevine," a subsidiary of Defendant Victory. The products were refused by Grapevine. Cohen was "concerned that [he] may be stuck with some counterfeit products" but he did not send the products to any lab to be tested. The reasons why Grapevine refused the products and why Cohen was concerned the items might be counterfeit is not clear from the submitted testimony. In any event, Cohen called Gruenberg who agreed to accept a return of the product. One container was, in fact returned. When the second container was ready to be shipped, Gruenberg called Cohen and said not to ship it back to Uruguay because they had a customer who was going to buy it. The materials submitted on the motion do not indicate what then actually happened to the second container of shampoo.

In an effort to demonstrate the sale of *counterfeit* Pantene and Head & Shoulders products, Plaintiff submit the affidavit of Kyle Klas ("Klas"), an employee of P&G,[7] who inspected certain shampoos purchased by Quality King and by Rite-Aid.

Regarding the Quality King merchandise, Klas went to Quality King's warehouse in Suffolk County, New York in June 2004 to inspect samples of shampoo that King Quality

---

[6] Cohen's deposition testimony is confusing as to the relevant time frame, sometimes referring the fall of 2003 and at other times to the fall of 2004. Invoices from ATM to Global are dated November 2003.

[7] The Court is compelled to note that Klas's affidavit was submitted with Plaintiff's reply papers and not with Plaintiff's original moving papers. The Court would be justified in striking this and the other "new" documents, *see* note 8 *infra*, submitted in Plaintiff's reply papers. This material was available at the time the original moving papers were served and its submission on reply cannot be justified as responsive to new matter contained in Gruenberg's opposition papers. *See Aurora Loan Servs., Inc. v. Posner, Posner & Assoc., P.C.*, 513 F. Supp.2d 18, 19-20 (S.D.N.Y. 2007). The submission of this information on reply is particularly troubling given Gruenberg's known pro se status. In any event, the Court shall consider the information contained in these affidavits so as not to prolong these proceedings.

thought might be counterfeit Pantene products. Klas's visual inspection led him to conclude the products were counterfeit because (1) the labels did not have a protective finish; (2) the color and ink on the logo were not as vibrant or metallic as those on genuine bottles; (3) the bottles did not bear a "supplier ID", "mold ID" or "cavity number"; (4) the label was bigger than on genuine bottles; (5) the bottles were not wrapped in individual bags; (6) the cases the product were shipped in differed from genuine cases in that the artwork was different and the cases contained pre-printed UPC bar codes/numbers and product information written entirely in English or entirely in Spanish; (7) one of the ingredients was misspelled; and (8) the cases contained pre-printed day code, product and plant information. Klas's determination that the products were counterfeit was later confirmed by chemical analysis. No information is provided as to who sold these products to Quality King.

Klas also inspected certain merchandise purchased by Rite-Aid. The first inspection occurred as a result of a telephone call to Plaintiff's toll-free hotline in March 2004. A customer called to complain that a bottle denoted Pantene and purchased at a Rite-Aid pharmacy in Queens, New York, did not smell or look like genuine Pantene. When the bottle was purchased at Rite-Aid is unknown. On an unspecified date, Klas inspected the bottle of Pantene which was returned by the customer. Based on the packaging alone, Klas determined that the bottle was counterfeit. "Except for the fact that the packaging did not contain the same spelling error in the ingredient list, and it may not have been shipped in counterfeit cases similar to those found at Quality King, the packaging used on this counterfeit Pantene was identical to the packaging used on the counterfeit Pantene . . . found at Quality King."

The second inspection of products purchased by Rite-Aid apparently resulted from Rite-

Aid contacting Plaintiff about some Head & Shoulders and Pantene which Rite-Aid suspected might be counterfeit. On June 18, 2004, Klas went to a Rite Aid distribution center in Rome, New York to inspect the product. Klas determined that the Pantene was counterfeit because of the following difference between the inspected samples and genuine Pantene products: (1) the color and ink used were not as vibrant or metallic; (2) the inspected samples did not contain a "supplier ID", "mold ID" or "cavity number"; (3) the cases the counterfeit products were shipped in had no angled corners and contained preprinted day code, product and plant information and the day code on the case did not match the day code on the bottles. Klas also determined that the inspected samples of Head & Shoulders were counterfeit based on differences between the packaging of the inspected items and genuine Head & Shoulder products.

At another unspecified date, Klas made a third inspection of product purchased by Rite-Aid. Klas inspected a bottle of Pantene that he was told was found at a Rite-Aid distribution center in Perryman, Maryland. He determined that the bottle was counterfeit because the label was taller than a genuine Pantene label and the logo was less vibrant and metallic. In addition, the bottle had no mold markings and the back label contained a number of typographical errors.

Jan Grammerstorf, an employee of Plaintiff,[8] asserts that representatives of Rite-Aid have advised him that they "believe" and "think" they purchased the counterfeit products found in the Rite-Aid Rome distribution center, as well as that purchased in the Queens Rite-Aid, from Victory. According to Grammerstorf:

> Rite Aid assigns a number to all of its vendors. Victory's vendor number is 38063. Rite Aid also assigns a "product identification tag number" or "receiving number" or "RCN" to

---

[8] Grammerstorf's affidavit, like the Klas affidavit, was submitted with Plaintiff's reply.

> every purchase order it receives from alternative service vendors, such as Victory. This enables Rite Aid to track the movement of those products through its distribution centers. For example, Rite Aid recently[9] discovered in one of its distribution centers counterfeit Pantene Pro-V Smooth and Sleek shampoo bearing tag number 8409030. Because of that tag number, Rite Aid was able to trace the counterfeit product back to purchase order number 3048412 and confirm that it purchased that product from Victory. . . . By way of another example, less than two weeks ago, Rite Aid discovered counterfeit Head & Shoulders Refresh shampoo bearing tag number or RCN 240412 at another one of its distribution centers. Because of that tag number, it was also able to trace that counterfeit product back to purchase order number 3059975 and confirm that it purchased that product from Victory. . . . At that same distribution center, Rite Aid also discovered counterfeit Pantene Pro-V Color Revival shampoo bearing the tag number or RCN 242250. Because of that tag number Rite Aid was also able to trace that counterfeit product back to purchase order number 3067161 and confirm that it purchased that product from Victory.

Aff. of Jan Grammerstorf at ¶6. Purchase orders attached to the Grammerstorf affidavit seem to indicate that the products were ordered by Rite-Aid in January and February 2004. No information is provided as to who sold these products to Victory or when they were sold to, or received by, Victory.

*Discussion*

**I. Summary Judgment Standard**

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates both the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are

---

[9] Grammerstorf's affidavit was executed on July 6, 2004.

material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *See Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 254-55. A district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide the district court in its determination of a summary judgment motion. *See Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). When the moving party bears the burden of proof on an issue, the moving party's burden on a summary judgment motion is "to come forward with evidence on each material element of his claim or defense, thus demonstrating that he or she is entitled to relief." *Ernest Lawrence Group v. Marketing the Americas, Inc.*, 2005 WL 2811781, *4 (S.D.N.Y. Oct. 27, 2005) (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Accordingly, where, as here, a plaintiff is moving for summary judgment on its cause of action, the plaintiff must submit evidence on each material element of the cause of action and that evidence must be sufficient to entitle the plaintiff to relief

9

in its favor as a matter of law. *See Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." *Id. Accord, D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006).

## II. The Lanham Act Generally

The Lanham Act, 15 U.S.C. § 1051 et seq., was designed to protect both consumers and registrants. It guards "the Public against deceit as to the sources of its purchases, . . . guarantees that a consumer who purchases a specific product receives the special characteristics associated with that product . . . and protects the registrants' right to enjoy business earned through investment in the good will and reputation attached to a trade name. In sum, the Act guarantees consistency and thus wards off both consumer confusion and possible deceit." *The Proctor & Gamble Co. v. Quality King Distribs. Inc.*, 123 F. Supp. 2d 108, 112 (E.D.N.Y. 2000) (internal quotations omitted) (quoting *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 636 (1st Cir. 1992); *Zippo Mfg. Co. v. Rogers Imports, Inc.*, 216 F. Supp. 670 (S.D.N.Y. 1963)).

Section 32(1)(a) of the Lanham Act provides that:

> (1) Any person who shall without the consent of the registrant -
> (a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake or to deceive . . . shall be liable in a civil action by the registrant.

15 U.S.C. § 1114(1)(a). Section 43(a) prohibits similar conduct but is not limited to registered

trademarks. It proves that:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which -
> (a) is likely to cause confusion, or to cause to mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .
> shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A)

To establish liability under either Section 32 or 43(a) of the Lanham Act, the "plaintiff must show that 'it has a valid mark entitled to protection and that the defendant's use of it is likely to cause confusion.'" *Arrow Fastener Co. v. The Stanley Works*, 59 F.3d 384, 390 (2d Cir.1995) (quoting *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir.1993)). *Accord Proctor & Gamble*, 123 F. Supp. 2d at 113 ( "plaintiff must prove: (1) that it owns a valid, protectable trademark; (2) that the defendants used the registrant's trademark in commerce and without consent; and (3) that there was a likelihood of consumer confusion."). *See generally Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114 (2d Cir. 2006) (noting that the same analysis is applied to claims under Sections 32 and 43 of the Lanham Act). Knowledge and intent are not relevant to the issue of liability under sections 32 and 43; they are, however, relevant to the issue of damages. *Proctor & Gamble*, 123 F. Supp. 2d at 113 (citing cases).

### III. Unfair Competition Generally

Unfair competition under New York law is "the bad faith misappropriation, for

commercial advantage of one person, [of] 'a benefit or property right belonging to another person.'" *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005) (quoting *Volmar Distribs. v. New York Post Co.*, 899 F. Supp. 1187, 1197 (S.D.N.Y. 1995) and *Metro. Opera Ass'n v. Wagner-Nichols Recorder Co.*, 199 Misc. 786, 793, 101 N.Y.S.2d 483, 489 (Sup. Ct., N.Y. County 1950), *aff'd*, 279 A.D. 632, 107 N.Y.S.2d 795 (1st Dept. 1951). *Accord Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980) (essence of New York's unfair competition law "is that the defendant has misappropriated the labors and expenditure of another"). The analysis of a cause of action for unfair competition under New York law is essentially the same as that for a Lanham Act violation. As summarized by one court:

> It is well-established that the elements necessary to prevail on causes of action for trademark infringement and unfair competition under New York common law "mirror the Lanham Act claims." *Malletier v. Dooney & Bourke, Inc.*, 340 F. Supp. 2d 415, 436-37 (S.D.N.Y. 2004) (citations and quotations omitted); *see also Standard & Poor's Corp v. Commodity Exch., Inc.*, 683 F.2d 704, 708 (2d Cir. 1982) ("The heart of a successful claim based upon [both] . . . the Lanham Act . . . and [the] common law [causes of action] . . . is the showing of a likelihood of confusion as to the source of sponsorship of defendant's products."). However, unlike its federal counterpart, a viable common law claim for unfair competition requires an additional showing of bad faith. *See Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 383 (2d Cir. 2000) ("To determine that misappropriation has occurred, bad faith must be found . . . .") (citations omitted); *see also Saratoga Vichy Spring*, 625 F.2d at 1037 (noting that central to the "notion" of unfair competition under New York law is "some element of bad faith").
> Therefore, to prevail on its claim for unfair competition under New York common law [Plaintiff] must combine its evidence supporting liability under the Lanham Act with additional evidence demonstrating that defendants acted in bad faith. *See Phillip Morris USA*, 2004 WL 1375277 at *6, 2004 U.S. Dist. LEXIS 11154, at *22-23. However, "[u]nder New York law, a

12

presumption of bad faith attaches to the use of a counterfeit mark."
*Id.* (citing *Centaur Communications, Ltd. v. A/S/M Communications Inc.*, 830 F.2d 1217, 1227 (2d Cir. 1987) . . . .

*Lorillard Tobacco*, 378 F. Supp. 2d at 456 (brackets and ellipses in original). Accordingly, this Court's analysis of P & G's unfair competition claim is subsumed in the discussion of the Lanham Act claims.

## IV. The Motion for Summary Judgment is Denied.

There is no issue of fact as to the ownership by Plaintiff of a valid trademark entitled to federal protection. Plaintiff has submitted certificates of registration with the United States Patent and Trademark Office (PTO) for names "Pantene," "Pro-V" and "Head and Shoulders," as well as for certain aspects of the trade dress of these three products. "A certificate of registration with the PTO is prima facie evidence that the mark is registered and valid (*i.e.*, protectable), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir 1999). Gruenberg has not submitted any evidence to rebut the presumption of the marks' protectability or Plaintiff's ownership thereof.

In determining whether there is a likelihood of confusion, courts usually apply the eight factors set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). Such is not the case when counterfeit marks are involved:

> [I]n cases involving counterfeit marks, "the Court need not undertake a factor-by factor analysis under *Polaroid* because counterfeits, by their very nature cause confusion." *Gucci America, Inc. v. Duty Free Apparel, Ltd.,* 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003); *Phillip Morris USA Inc. v. Felizardo*, 2004 WL 1375277, at *5 (S.D.N.Y. 2004). Thus, the Court "need only determine the more fundamental question of whether there are items to be confused in the first place - that, is whether the items at

issue here are, in fact, counterfeit, and whether defendant . . . sold those items." *Gucci America, Inc.* 286 F. Supp. 2d at 287.

*Phillip Morris USA Inc. v. Marlboro Express*, 2005 WL 2076921, *4 (E.D.N.Y. Aug. 26, 2005). *Accord Lorillard Tobacco*, 378 F. Supp. 2d at 455 (where counterfeit marks are involved, court need only consider whether the items are in fact counterfeit and whether those items were offered for sale by the defendant).

It is P & G's position that "APO Health purchased shampoo labeled Pantene and Head & Shoulders only from Gruenberg, that APO Health sold that shampoo to Quality King and Victory . . . , that the shampoo Quality King purchased from APO tested counterfeit in packaging and content . . . , that Victory sold the shampoo it purchased from APO to Rite Aid, and that the shampoo Rite Aid purchased from Victory tested counterfeit in packaging and content." Reply Mem. at 2. However, the evidence submitted by Plaintiff on the motion does not support these assertions.

The submitted deposition testimony of Stahl supports only a sale by APO to Quality King. As noted above, Stahl's testimony is that he offered the products to Victory, not that he sold the products to Victory. Moreover, while there is uncontroverted evidence that Quality King had counterfeit products, there is no evidence to link those counterfeit product to Gruenberg. While Stahl asserts that APO only purchased Pantene and Head & Shoulders from Gruenberg, there is no evidence that Quality King purchased Pantene and Head & Shoulders only from APO or that the counterfeit products found at Quality King's warehouse in June 2004 were purchased from APO or Gruenberg, as opposed to another entity. In addition, Gruenberg denies that he was involved in the sale of any counterfeit products.

A similar deficiency exists with respect to the products found at Rite-Aid. There is no

triable question of fact that those goods were counterfeit. For purposes of this motion the Court will even accept that Rite-Aid can trace the counterfeit products to Victory.[10] There is, however, no evidence to link Gruenberg to Victory. Stahl's deposition testimony does not support that APO made a sale to Victory. While Cohen testified that he sold Pantene and Head & Shoulders products from Gruenberg to Victory's subsidiary, he also testified that those goods were rejected. Thus, no inference can be drawn that the counterfeit goods sold by Victory to Rite-Aid came from Gruenberg through Global. Nor is there evidence to conclude that the rejected goods were, in fact, counterfeit. As set forth above, Cohen's testimony is only that he was "concerned that [he] may be stuck with counterfeit products." He did not send the products to a lab. His deposition testimony does not explain the basis for his concern or the reasons offered by Grapevine for rejection of the products.

In sum, Plaintiff has failed to proffer sufficient evidence on the fundamental question of whether Gruenberg sold counterfeit items. Plaintiff's burden was to submit evidence on each material element of its cause of action, which evidence is sufficient to entitle the plaintiff to relief as a matter of law. It has not done so. The evidentiary gaps set forth above, together with the Court's obligation to draw all inferences and resolve all ambiguities in favor of the non-movant, mandate denial of the motion. Among the material issues of fact are whether Gruenberg sold the counterfeit goods found at Rite-Aid and whether the counterfeit goods found at Quality King

---

[10] The Court notes, however, that Grammerstorf is an employee of P & G, not Rite-Aid, and has no apparent personal knowledge of Rite-Aid's practices regarding tracking the movement of products through its distribution centers. Moreover, the statements in his affidavit that Rite Aid advised him that they "think" and "believe" Rite Aid purchased the counterfeit products from Victory are hearsay. *See Rus Inc. v. Bay Indus.*, 322 F. Supp. 2d 302, 307 (S.D.N.Y. 2003) ("To the extent that an affidavit or declaration contains material that does not comply with Rule 56(e), the Court may strike those portions, or may simply disregard them.")

were goods sold by Gruenberg.

Nor does Plaintiff's assertion that Gruenberg conspired to manufacture P & G products change this result. In support of this conspiracy, Plaintiff points to the e-mails between Harrick and Chou, some of which were forwarded to Gruenberg. There is no evidence the e-mails regarding "shampoo," "H&S" or "Pant" were received by Gruenberg or that he responded to them so as to permit even an inference that he was part of the alleged international counterfeiting trafficking in Plaintiff's products. *Cf. ITC Limited v. Punchgini, Inc.*, 482 F.3d 135, 152-53 (2d Cir.2007) (holding that because of the lack of evidence that plaintiff responded to unsolicited e-mails concerning expanding Plaintiff's restaurant franchise to other areas no reasonable jury could infer from the e-mails that Plaintiff intended to resume use of its mark for restaurants). Moreover, Gruenberg denies receiving the e-mails, creating a contested issue of fact.

## Conclusion

For the reasons stated herein, Plaintiff's motion for summary judgment is denied. Plaintiff is directed to serve and file a written status report within twenty (20) days of the date hereof. Said status report shall set forth those defendants against whom claims remain pending and the status of discovery thereon.

**SO ORDERED.**

Dated: Central Islip, New York
      February 8, 2008

                                      /s/
                                      Denis R. Hurley
                                      Senior District Judge